IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
September 5, 2018 Session

## STATE OF TENNESSEE v. CORDARIOUS FRANKLIN

**Appeal from the Criminal Court for Shelby County**
**No. 15-01192        Lee V. Coffee, Judge**

_____

### No. W2017-00680-CCA-R3-CD

_____

Defendant, Cordarious Franklin, was convicted of rape of a child, aggravated sexual battery, and child abuse. The trial court imposed consecutive sentences of forty years for rape of a child, twelve years for aggravated sexual battery, and eleven months, twenty-nine days for child abuse. On appeal, Defendant raises the following issues: (I) whether the trial court erred by admitting the victim's forensic interview; (II) whether the evidence was sufficient to support Defendant's convictions; (III) whether the trial court erred in denying Defendant's request to review the victim's medical records; (IV) whether the trial court erred by failing to give the jury a *Ferguson* instruction; (V) whether a juror's questions amounted to extraneous prejudicial information; (VI) whether Defendant's sentence was improper; and (VII) whether there was plain error due to an *ex parte* conversation between the State and the trial court and by the trial court's exclusion of Defendant's family from the courtroom during the victim's testimony. After review, we conclude there is structural constitutional error by the trial court excluding the public from the courtroom and therefore reverse the judgments and remand for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right;**
**Judgment of the Criminal Court Reversed and Remanded**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT H. MONTGOMERY, JR., JJ., joined.

Andre C. Wharton, Memphis, Tennessee (on appeal) and Tim Williams and Krista Holder-Williams, Memphis, Tennessee (at trial) for the appellant, Cordarious Franklin.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Counsel; Amy P. Weirich, District Attorney General; and Jennifer Shurson and Lessie Rainey, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

*Background*

Initially, we note that in order to protect the minor victim, she will be referred to solely throughout this opinion as "the victim." In addition, we will refer to the victim's mother and other members of the victim's immediate family by their initials in order to further protect the victim's identity. C.D., the victim's mother, testified that on December 7, 2013, she was living with Defendant and their two children. When she arrived home from work at 10:00 p.m., Defendant said that he was going to go to the store which was located "a little walk" from their apartment. C.D. thought that Defendant was acting strangely because he told the children to stay in their rooms, and he was very quiet.

As C.D. began cooking, the four-year-old victim walked out, and C.D. noticed a dark bruise under the victim's left eye. The child said that Defendant did it, but she did not say how Defendant bruised her eye. She also said that Defendant put his "cootie" in her mouth and told her not to bite it. C.D. testified that cootie is another word for "private area." The victim also said that Defendant told her to move her hands up and down on his private area (penis) and to suck on it. The victim indicated that the offense occurred while C.D. was at work and that Defendant told the victim's brother to go into his room and watch television before the offenses occurred. C.D. called her mother who in turn called police. The victim went to the bathroom and called for C.D. The victim said that she had "red stuff" on the tissue. C.D. also saw "pinkish red" in the toilet. She was told by police to take the victim to Le Bonheur Children's Hospital.

Police arrived at the apartment and then left to find Defendant at the store. After the police left, C.D. got a knife and began looking for Defendant. As Defendant approached the apartment complex, C.D. met him at the front gates with a knife and the intent to kill him, but police stopped her. The victim was taken to Le Bonheur Children's Hospital for an examination. She was also questioned by someone from "Child Services." The victim's grandfather stayed with her while C.D. went back to the apartment for police to take pictures and collect evidence.

C.D. returned to Le Bonheur Children's Hospital and later took the victim to the Rape Crisis Center where she received another exam. The victim was "pretty much telling everyone the same thing." C.D. also noted that the victim had diarrhea while at the Rape Crisis Center, although the victim had never mentioned being sick. C.D. took the victim to the Memphis Child Advocacy Center on a later date. C.D. admitted that she eventually spoke with Defendant again and let him see his children a couple of times. She testified that the victim still loved Defendant. C.D. also admitted apologizing to Defendant and asking for his forgiveness after finding out that she was pregnant with his

third child. She said that she was apologizing for the situation in which they found themselves and not because she made up anything about the offenses in this case.

On cross-examination, C.D. testified that she and Defendant had been together for six years at the time of the offenses in 2013. She said that the victim had never witnessed any type of sexual activity between her and Defendant and that she had a bedroom door that closed and locked. When asked exactly what the victim told her at the time of the offenses, C.D. testified that the victim told her, "My dad put his cootie in my mouth and told me to suck on it." The victim did not respond when C.D. asked her about the bruise other than to say that Defendant did it.

C.D. admitted that she refused offers of counseling for the victim because the victim did not like talking about what happened, and it would be a "constant reminder." C.D. denied that seeing the video of the victim's forensic interview influenced C.D.'s statement to police because she saw it after the statement. C.D. believed she told police that Defendant told the victim not to bite his penis. C.D. admitted that she contacted Defendant through Facebook after the offenses occurred and sent him the following message:

> I'm sorry. I know you love your daughter. God knows she loves you. When I see y'all, it's a bond like no other. I know you would never do anything to harm them. Please don't be mad at me for my concerns as a mother. You have no idea how much in my heart I didn't want to believe it happened 'cause I love you just as much. I'm sorry. You can still see the kids when you want. They love seeing you. Even [the victim] is coming back around to you."

C.D. testified that she also sent Defendant a message that read: "Do you forgive me? Really, I truly am sorry. If I've ever admitted I was wrong before, I am now." C.D. admitted she was not present when Defendant saw the victim while the victim was at his sister's house. She did not know for certain if the victim was alone with Defendant during the visit.

On redirect, C.D. testified that she did not tell Defendant that she was wrong for calling the police and protecting the victim. She also said that she did not accept counseling for the victim because she thought that the victim, at her age, did not understand that what happened to her was wrong.

Teresa Onry, a forensic interviewer with the Memphis Child Advocacy Center, testified that she interviewed the victim in this case on December 16, 2013. As soon as the interview began, the victim disclosed what happened. Ms. Onry testified that she was alone with the victim during the interview, and the victim answered questions appropriately for her age. There were also two observers listening from another room.

Ms. Onry explained that children have "flashbulb" memories, which meant that "they remember something and then they say it." She said that the victim was calm and soft-spoken during the interview and did not seem intimidated by her surroundings.

Sally Discenza, a forensic examiner/nurse at the Rape Crisis Center, testified as an expert in sexual assault forensic examination. She examined the victim on December 8, 2013. She obtained the victim's medical history from the victim's mother who said that she got home from work and noticed a bruise on the victim's face. Concerning the victim's medical history, Ms. Discenza further testified:

> The child also disclosed her dad told her to go to the bedroom and close the door. Her father told her to put his "cootie" - - and I clarified with the mother what that meant, which it meant his penis - - in her mouth and suck on it. Her father also put his red bandana on her head. And the father made her rub his penis up and down. And the mother demonstrated what the child demonstrated to her. [The victim] told her mother her cootie was bleeding and then they went to Le Bonheur.

Ms. Discenza testified that she spoke with the victim alone. She noted that the victim's demeanor was "sad" and "quiet" but that the victim was also "articulate" and "specific" about what happened. Ms. Discenza testified:

> [The victim] said, um, I started it out by asking her what happened to her eye. And she stated, "[Defendant] hit me. He put his thing in my mouth and told me to suck on it." And I clarified with her what his "thing" was. And she clarified "his cootie," and then I clarified with her what that meant to her, which was his penis. "He told me to do this too," and she demonstrated holding something in her hand and going up and down. "He put his cootie on my butt. There was blood on the tissue." Saying - - I asked her had he done this before, and she said yes. And I asked her how many times he did this before, and she said three.

Ms. Discenza testified that her physical examination of the victim revealed a bruise and swelling under the victim's right eye. She noted that the injury was recent due to the "purple red" discoloration of the victim's skin, and there was still swelling. Ms. Discenza did not find any injury to the victim's genital or anal area, which was not uncommon in cases of child sexual assault. Ms. Discenza testified that the bleeding noted by the victim could have occurred internally and not been visible from the exam. She noted that the anal area, especially, had an "autonomic response that it will dilate up" to prevent injury. Ms. Discenza collected a rape kit from the victim. She noted that the victim had eaten food prior to the examination and that she had also had a bowel movement and diarrhea prior to the examination. Therefore, Ms. Discenza was not

surprised that no DNA was found on the oral or anal swabs taken from the victim. She said that her findings supported the victim's history of sexual assault.

On cross-examination, Ms. Discenza testified that she had no way of knowing if someone influenced the victim before Ms. Discenza spoke to her. However, she testified that the victim was very bright and articulate and that she was able to tell Ms. Discenza exactly what occurred. Ms. Discenza said:

> So again, with what occurred, that that was - - that history is something that you wouldn't normally meet. Normally a child does not say that. You know what I mean? That doesn't occur typically. That's not what their experience is. So there was something that occurred that made her have these experiences.

She noted that "most children don't come up and say, 'Someone put their cootie in my mouth.'"

Ms. Discenza acknowledged that a bruise under someone's eye was not indicative of any type of sexual trauma. She also said that there was no dilation of the anus in the victim's case. Ms. Discenza assumed that a younger child would have more anal trauma from penetration by an adult than an older child. She noted that "as literature supports, it's in all children that in more instances than not you're going to have a normal exam. In examining children of sexual assault, there's more instances than not that the exam is going to be normal." Ms. Discenza agreed that she did not find any physical evidence of rape or a sexual assault. She also agreed that it could be just as likely, from the physical observations, that the victim was raped as that she was not raped. The parties stipulated that all of the DNA swabs from the victim tested negative for semen.

The victim, now seven years old, testified that she recalled living in an apartment with her brother, mother, and Defendant. She recalled a conversation with her mother in the kitchen before they moved out of the apartment during which her mother asked, "What you do to get your mark on your face?" She told her mother that Defendant did it. The victim noted that her mother was cooking breakfast foods for dinner, and she had walked into the kitchen to help her mother cook. When asked if her mother asked her any further questions, the victim replied, "No." When asked if she told her mother anything else during the conversation, the victim replied, "Yes." However, she did not remember what she told her mother. The victim testified that her mother called police after their conversation, and officers came to the apartment. She later went to the hospital and to the Child Advocacy Center. The victim recalled talking to "Ms. Teresa" and that she told Ms. Teresa the same thing that she told her mother. She said that the conversation was recorded and that she had watched the video. The victim testified that she told the truth during her conversations with her mother and with "Ms. Teresa."

The victim testified that on the day of the offenses, she was at home with her mother, brother, and Defendant. At some point, her mother left to go to work. The victim noted that their apartment had two bedrooms and that she shared a room with her brother, and her mother and Defendant shared the other bedroom. The victim testified that Defendant told her to go into his bedroom by herself, and she sat on the floor watching television. Defendant then walked into the room and sat on the bed. He also asked the victim to sit on the bed with him. At that point, Defendant removed his pants and underwear but not his shirt. With the aid of a doll during her testimony, the victim testified that Defendant touched inside of both her "butt" and her mouth with his "[p]rivate part." The victim further testified that when Defendant placed his private part in her mouth, he said, "Don't bite it."

When asked what Defendant told the victim to do with her hands, the following exchange took place:

> [Prosecutor]: Okay. And did he tell you to do anything with your hands?
> [The victim]: Yes.
> [Prosecutor]: Can you show us what he told you to do with your hands?
> [The victim]: Yes.
> [Prosecutor]: Yes? Would you show us, please?
> [The victim]: He told me to do this (indicating).
> [Prosecutor]: He told - - okay. Can you hold your hands up just a little bit higher?
> [The victim]: Yes.
> [Prosecutor]: And show us again.
> [The victim]: He told me to do this (indicating).
> [Prosecutor]: Okay. And did you do what he said?
> [The victim]: Yes.
> [Prosecutor]: The hand gesture that you made that he told you to do, were you touching his private part when you did that?
> [The victim]: Yes.

The victim testified that after that, Defendant touched her butt with his private part. When asked if Defendant placed a red piece of fabric over her eyes, the victim replied, "No." However, she agreed that she could not remember. She said that Defendant did not say anything after he touched her, and she had some Kool-aid. The victim later went to the restroom and noticed blood on the tissue and in the toilet, and she notified her mother to look at it. The victim agreed that her testimony was the same as she told her mother and "Ms. Teresa."

On cross-examination, the victim testified that she came to the courthouse on the Sunday before trial and watched the video of her interview. She also watched it in an office the Friday before trial. The victim denied watching the video at her house. The following exchange then took place:

> [Defense Counsel]: Okay. Do you know if you get in trouble, you say some certain things happen. I think Monday you told the court that you get whippings sometimes?
>
> [The victim]: Yes.
>
> [Defense Counsel]: And today you could go to jail.
>
> [The victim]: Yes.
>
> [Defense Counsel]: Did someone tell you you could go to jail?
>
> [The victim]: No.
>
> [Defense Counsel]: You just said that?
>
> [The victim]: Yes.
>
> [Defense Counsel]: After that day, that day that you had the black eye, or the bruise on your eye - -
>
> [The victim]: Yes?
>
> [Defense Counsel]: - - do you - - you remember talking, you said, right?
>
> [The victim]: Yes.
>
> [Defense Counsel]: You remember telling your mother, but you can't remember what you told her?
>
> [The victim]: Yes.
>
> [Defense Counsel]: Is that right?
>
> [The victim]: Yes.
>
> [Defense Counsel]: Okay, so you don't remember? So, and you said - - you told Ms. Rainey that you didn't remember what you told the people at the hospital right?
>
> [The victim]: Yes.
>
> [Defense Counsel]: Okay. And so - - but after you saw the video, did someone tell you you had to say what was on the video today or you could go to jail?
>
> [The victim]: No.
>
> [Defense Counsel]: No? Did anyone say anything about you could get a whipping if you don't tell the Court about the video?
>
> [The victim]: No.
>
> [Defense Counsel]: Okay. So, so you don't remember what you told your mom, you don't remember what you told the police, and you really don't remember what happened that day, is that about it?
>
> [The victim]: Yes.
>
> [Defense Counsel]: So you don't remember? Is that right? I'm sorry.

| | |
|---|---|
| [The victim]: | Yes. |
| [Defense Counsel]: | You do not remember? So the way you're remembering, is it because they showed you the video at least three times? Is that about it? |
| [Prosecutor]: | Judge? |
| THE COURT: | Yes, ma'am? |
| [Prosecutor]: | If he can ask one question at a time. |
| [Defense Counsel]: | Oh, I'm sorry. |
| THE COURT: | Yes, sir, [defense counsel], if you'd ask one question, please. And [victim], if someone asks a question and you don't understand what's being asked, let me know and we'll get him to ask a better question, okay? |
| [The victim]: | Okay. |
| THE COURT: | Yes, sir, [defense counsel], you may proceed. |
| [Defense Counsel]: | [Victim], so you just said yes when I asked you - - when I asked you if you did not remember what happened. |
| [The victim]: | Yes. |
| [Defense Counsel]: | And the only reason you remember is because they showed you the video three times. |
| [The victim]: | Yes. |
| [Defense Counsel]: | So was it confusing to talk to all those people? |
| [The victim]: | No. |

The victim testified that her mother took her to the hospital and that her grandfather was not there. She also said that her mother never left the hospital. The victim testified that she left Le Bonheur and went to another building. She was there until sunrise, and she then went home with her mother. The victim testified that she spoke with Ms. Onry and watched the video approximately ten days to two weeks later. She did not recall seeing Defendant since the incidents occurred. The victim testified that she was not afraid of defense counsel, and no one told her to say at trial what was on the video. She said that no one told her to use the word "cootie" for private parts and that she used the word on her own. The victim told defense counsel that she did not remember what happened on the day of the offenses. She also said that she did not know anyone named "Laquisha."

On redirect examination, the victim testified that she remembered what she told her mother on the night of the offenses. However, she did not want to talk about it. She also said that she remembered what happened in the bedroom between her and Defendant but she did not want to talk about it. The victim testified that she was telling the truth in the video about what happened. When asked if she had done the best she could do to tell the truth in court, the victim replied, "Yes."

On recross-examination, the victim testified that she had been to an aunt's apartment sometime after the offenses occurred, and she saw Defendant at the apartment. However, he did not spend the night there. She did not recall seeing Defendant at her grandmother's house.

Following the victim's testimony, the video of her forensic interview was played for the jury. In the video, the victim told Ms. Onry that Defendant "watched" her and her younger brother while their mother was at work and that Defendant "messed" with the victim. The victim said that Defendant put his "cootie" in her mouth and told her to "suck on it." She said that Defendant also told her to move her hands up and down on his "cootie," and the victim demonstrated what she did. The victim told Ms. Onry that Defendant also put his "cootie" in her "butt" and that there was blood on the tissue when she used the bathroom. She said that the incidents occurred in her mother's house in her mother's bedroom. The victim told Ms. Onry that her younger brother saw her suck Defendant's "cootie."

The victim told Ms. Onry that her mother saw a mark on her face. The victim said that the mark was caused by Defendant, but she did not know how it happened. The victim first told Ms. Onry that her clothes were on when Defendant put his "cootie" in her "butt." However, she later said that Defendant told her to get on the floor, and he removed her pants. The victim said that it hurt when Defendant put his "cootie" in her "butt." She said that Defendant placed a "red thing" on her head and over her eyes so that she could not see. The victim said that she had sucked Defendant's "cootie" two times, and he put his "cootie" in her "butt" one time. He also put his mouth on her mouth. The victim told Ms. Onry that Defendant had tattoos on his arms and on his "cootie." She used pictures to show where Defendant put his "cootie." The State then rested its case.

Mary Turner, Defendant's grandmother, testified that Defendant, C.D., and their children, including the victim, lived with her during 2013-2014. Ms. Turner testified that she turned her living room into a bedroom by placing sheets at the "entranceway." She said that Defendant and C.D. had a pullout bed, and the children slept in a baby bed. When asked if she had any personal knowledge of Defendant and C.D. having sex with the children in the room, Ms. Turner replied, "Well, I have - - I have heard them and heard them say, 'Ya'll lay down.'" She then heard sounds that she interpreted as Defendant and C.D. having sex. Ms. Turner also testified that Defendant and the victim had been at her house together after December of 2013 along with C.D. and Defendant's son. Ms. Turner testified that the victim loved Defendant and did not appear to be afraid of him. She also called him "Daddy."

On cross-examination, Ms. Turner agreed that the offenses in this case were alleged to have occurred in December of 2013. She acknowledged writing a letter in which she said that Defendant and his family lived with her after the victim was born in

2009. However, Ms. Turner testified that they lived with her "off and on" for two or three years. She agreed that Defendant and his family lived with her before the victim was born and afterwards.

On redirect examination, Ms. Turner testified that she believed that Defendant and his family last stayed with her sometime before the victim turned four years old. During that time she heard the noises coming from the bedroom area.

Laquisha McGhee, Defendant's girlfriend, testified that she and Defendant began dating in June 2013. She said that she had spent time with the victim more than ten times at her house, Defendant's sister's house, and Defendant's mother's house. She said that C.D. brought the victim to her house and that Defendant was never alone with the victim. Ms. McGhee testified that C.D. never told her that Defendant could not be alone with the victim. She said that the victim did not appear to be afraid of Defendant, and she called him "daddy." She also said that Defendant and the victim appeared to have a normal relationship. Ms. McGhee testified that she had never seen a tattoo on Defendant's penis.

Dominique Franklin, Defendant's sister, testified that Defendant and C.D. had been together since the two were seventeen years old, and they had three children together. She testified that Defendant met Ms. McGhee in 2014 rather than 2013. Ms. Franklin testified that C.D. would bring her children, including the victim, to Ms. Franklin's house while the charges against Defendant were pending, knowing that Defendant would be there. She said that C.D. dropped the children off on several occasions and left without giving Ms. Franklin any kind of instructions on whether or not Defendant could see the children. Ms. Franklin described the relationship between C.D. and Defendant as "cordial."

Ms. Franklin testified that she visited Defendant's apartment after he and Ms. McGhee began living together, and the children, including the victim, were there on several occasions alone with Defendant. She said that the children also stayed there overnight.

Defendant testified that he woke C.D. at approximately 5:30 a.m. on the morning of the offenses and escorted her to the bus stop so that she could go to work. He then walked back to the apartment and lay down in the bedroom for one to three hours. Defendant testified that although the children had a separate bedroom, they did not have a bed so the children slept with him and C.D. Concerning the events of the day, Defendant testified as follows:

> [The victim] and [her brother] woke me up around 8:00 that morning
> 'cause they were hungry. I made them breakfast, which consisted of
> eggs and toast. They ate. They went back again and played their normal
> routine of games, which is - - consists of toys, blocks, things of that

- 10 -

nature. Around I want to say 12:00, I made them lunch, which consisted of chicken nuggets. That's what they like. They had chicken nuggets that day. The rest of the day went fairly normal. It was cartoons and playtime.

[C.D.] made [it] home around 10 that night in which me and [the victim] and herself, we brought up the groceries that she brought home from work that day. Her father was with her. He brought her home that day.

Defendant testified that he and the children were home all day, and no one came over. He noted that it was "extremely cold" that day.

Defendant testified that C.D. began cooking dinner after she arrived home and that she made "breakfast for dinner." He left to walk to a store, which was approximately thirty minutes away. Defendant testified that the victim asked to go to the store with him but he told her no because of the weather. He said that the victim was in the kitchen with C.D. when he left. Defendant testified that C.D. met him with a knife at the gates to the apartment complex when he arrived back from the store, and they had a scuffle. He said that police arrived, and he was eventually taken into custody and transported to the police department. Defendant testified that he was questioned and then escorted to his grandmother's house. He said that the victim did not have a bruise under her eye before he went to the store, and he had no idea how it happened. Defendant claimed that he learned of the injury when he received the State's discovery.

Defendant testified that he, the victim, C.D., and his son had lived with his grandmother, Mary Turner. At trial, the following exchange took place:

> [Defense Counsel]: Did you live at your grandmother's from the time C.D. was pregnant with [the victim]?
> [Defendant]: Yes, sir.
> [Defense counsel]: Did you live there when [the victim] was born?
> [Defendant]: Yes, sir.
> [Defense Counsel]: Did you live with her more than once?
> [Defendant]: Yes, sir.
> [Defense Counsel]: How long did you live with her when [the victim] was born?
> [Defendant]: From April up until in November of 2009.
> [Defense Counsel]: Okay. Did you move back in with her after that?
> [Defendant]: Yes, sir.
> [Defense Counsel]: Who all moved back in with her after that?
> [Defendant]: Me, [the victim], and her mother, [C.D.].

- 11 -

[Defense Counsel]: What about - - what about the other two?

[Defendant]: They weren't born yet, sir.

[Defense Counsel]: And how long did they live - - did y'all live there that time?

[Defendant]: Possibly like five or six months.

[Defense Counsel]: Then what happened? Where'd you live then?

[Defendant]: We actually had an apartment in the Red Oaks - -

[Defense Counsel]: How long did you stay there?

[Defendant]: We stayed there for another six or seven months.

[Defense Counsel]: Where'd you move after that?

[Defendant]: We moved back to my grandmother's.

[Defense Counsel]: Was [the victim's brother] born then?

[Defendant]: [The victim's brother] was actually on the way, he was on his way.

[Defense Counsel]: Did y'all stay there or not until [the victim's brother] was born?

[Defendant]: I stayed there. [C.D.], she had moved back with her mother.

[Defense Counsel]: Later, did you, [C.D.], [the victim], and [the victim's brother] live there together?

[Defendant]: Yes, sir.

[Defense Counsel]: How many times, do you recall?

[Defendant]: This would be - - this would be the third time.

[Defense Counsel]: Okay. How long did you live there with [the victim, [the victim's brother], and [C.D.]?

[Defendant]: We stayed there for I want to say about three or four months.

[Defense Counsel]: And where'd you go then?

[Defendant]: We moved to my grandmother's house.

[Defense Counsel]: [C.D.'s] grand- - [C.D.'s] grandmother?

[Defendant]: No, no, no, no, my grandmother. My father's side.

[Defense Counsel]: From your father's side.

[Defendant]: Yes, sir.

[Defense Counsel]: How long did all stay there?

[Defendant]: We stayed there, it was a fairly short amount, like three or four months.

[Defense Counsel]: Did y'all live with Mary Turner when [the victim] was three or four?

[Defendant]: We did. We actually did.

[Defense Counsel]: How long did y'all live there then?

- 12 -

[Defendant]: It was - - it was fairly short, like three months.

[Defense Counsel]: Excuse me one moment, please.

THE COURT: Yes, sir.

[Pause]

[Defense Counsel]: When y'all stayed there then, try to describe where your grandmother's room was and where your room was, the room y'all stayed in.

[Defendant]: Yes, sir, it was - - it was fairly close. It was only divided by a bathroom.

[Defense Counsel]: Bathroom?

[Defendant]: Yes, sir.

[Defense Counsel]: Is that a different place than y'all stayed before you had two children?

[Defendant]: No, sir.

[Defense Counsel]: And what furniture was in that room?

[Defendant]: There was a futon, which is a pulled out bed in which me and [C.D.] slept at. And there was a baby bed in which [the victim] and [the victim's brother] shared.

[Defense Counsel]: Was that a baby bed with - - like a standard baby bed with the bars and - -

[Defendant]: It was made like a crib.

[Defense Counsel]: So they didn't sleep with y'all in that bed?

[Defendant]: No, sir.

[Defense Counsel]: Did sexual activity occur between you and [C.D.] with those kids in that baby bed or not?

[Defendant]: They were, they were.

[Defense Counsel]: Were y'all making noise while y'all were - -

[Defendant]: (Inaudible) noise.

[Defense Counsel]: Did that or did it not wake up the children?

[Defendant]: On occasion it did.

[Defense Counsel]: What did y'all do then?

[Defendant]: We would instruct them (inaudible) - -

[Prosecutor]: Your Honor, I'm having trouble hearing the defendant.

THE COURT: Speak up a little bit louder, sir.

[Defendant]: Okay, yes, sir.

THE COURT: I'm sitting three feet from you, I can't hear you. I'm sure the jury can't if I can't. [Defense counsel] you may proceed.

[Defense Counsel]: Speak up, sir.

[Defendant]: We were actually instructing them to go to sleep and assured them that everything was fine.

- 13 -

Defendant testified that C.D. visited him after he moved in with Ms. Turner after he was "detained" and that she would "on occasion move in and move out." He moved in with his girlfriend, Laquisha McGhee, in June 2014 where he stayed until March 11, 2015. Defendant testified that he and C.D. had a third child who was born on August 28, 2014. He said that he saw the victim and his son while he was at his grandmother's house and after he had moved in with Ms. McGhee. He noted that the children would spend the night and that he was sometimes alone with the children.

Defendant testified that he was not guilty of the charges against him. He said that he did not put his "cootie" in the victim's mouth, and he did not have any tattoos on his penis. He also said that he did not place a blindfold on the victim or have anal sex with her.

On cross-examination, Defendant agreed that "up to the point when [the victim] was four years old," he spent most of the time with the victim and that he was around her almost every day and took care of her while C.D. was working. Defendant admitted that C.D. was angry and yelling at him when she met him at the gates with the knife when he returned from the store. He could not explain why the victim associated the bruise under her eye with sexual activity. Defendant acknowledged that the victim told three witnesses about the injury. He further acknowledged that the victim had not recanted her allegations despite the fact that she still loved Defendant. He believed that on the video of the interview, the victim on several occasions said that "my mother said" to say the things to police. Defendant agreed that the first thing that the victim told the interviewer was that Defendant "messed with me."

*Analysis*

### I.      Admission of the Victim's Forensic Interview

Generally questions concerning the admissibility of evidence rest within the sound discretion of the trial court, and this Court will not interfere with the exercise of that discretion in the absence of a clear showing of abuse appearing on the face of the record. *State v. McCoy*, 459 S.W.3d 1, 8 (Tenn. 2014). "A trial court abuses its discretion only when it applies an incorrect legal standard or makes a ruling that is 'illogical or unreasonable and causes an injustice to the party complaining.'" *Id.*

Tennessee Code Annotated section 24-7-123 allows a child-victim's forensic interview to be introduced into evidence, at the discretion of the trial judge, if certain requirements are met. It states:

> a video recording of an interview of a child by a forensic interviewer containing a statement made by the child under thirteen (13) years of age describing any act of sexual contact performed with or on the child by

another is admissible and may be considered for its bearing on any matter to which it is relevant in evidence at the trial of the person for any offense arising from the sexual contact if the requirements of this section are met.

Tenn. Code Ann. § 24-7-123(a). The statute goes on to provide that the video recording must be shown to the trial court in a hearing, conducted pre-trial, and possess "particularized guarantees of trustworthiness," which is to be determined by the trial court. *Id*. § 24-7-123(b)(2). In making such determination, the statute outlines several factors for the trial court to consider:

(A) The mental and physical age and maturity of the child;
(B) Any apparent motive the child may have to falsify or distort the event, including, but not limited to, bias or coercion;
(C) The timing of the child's statement;
(D) The nature and duration of the alleged abuse;
(E) Whether the child's young age makes it unlikely that the child fabricated a statement that represents a graphic, detailed account beyond the child's knowledge and experience;
(F) Whether the statement is spontaneous or directly responsive to questions;
(G) Whether the manner in which the interview was conducted was reliable, including, but not limited to, the absence of any leading questions;
(H) Whether extrinsic evidence exists to show the defendant's opportunity to commit the act complained of in the child's statement;
(I) The relationship of the child to the offender;
(J) Whether the equipment that was used to make the video recording was capable of making an accurate recording; and
(K) Any other factor deemed appropriate by the court[.]

*Id.* § 24-7-123(2)(A)-(K). If the trial court determines that the video recording is not trustworthy, the inquiry ends, and the evidence will not be admitted. *Id*.

Concerning this issue, the trial court made very detailed findings:

For the record, the court, as required by 20 - - Tennessee Code Annotated 24-7-123, makes the following specific findings of facts in this case:

This is actually a legal question that the Court has to determine as to whether or not this video is in fact admissible. The Supreme Court

- 15 -

and Tennessee case law has indicated consistently persistently [sic] that videotapes of child victims are in fact admissible. The question of admissibility has been determined conclusively against [Defendant] as long as certain criteria are met. Will not put the cases on the record, but Tennessee Supreme Court opinions and Court of Criminal Appeals opinion[s] have conclusively and persistently determined that the statute is in fact constitutional, that 24-7-123 is in fact constitutional. There have been arguments that have been made that the act is in fact violative of a defendant's confrontation rights, that is hearsay and should not in fact be admissible. But those decisions have been decided against [Defendant] and other folks that are similarly situated. Crawford versus Washington, C-R-A-W-F-O-R-D versus Washington would indicate that if statements made out of court, made to law enforcement that are made for purposes of preserving or producing testimony in court that those in fact become testimonial and under some circumstances it is in fact considered hearsay. But our Supreme Court and the Court of Criminal Appeals have ruled that this statute is in fact constitutional, 24-7-123.

And this Court finds pursuant to Tennessee Code Annotated 9-4-213 Ms. Onry testified that Memphis Child Advocacy Center, she's worked there for seven years. It is in fact a nonprofit organization, does have a board of directors, there is a memorandum of understanding that has been filed, has been signed by the District Attorney General's Office, all local law enforcement officers, that it is part of the Child Protective team in that the organization does in fact - - is established in its own building. They have no contract, not part of law enforcement. These are private folks that have been trained in forensic interviews that go through this process.

Ms. Onry has a bachelor's in Psychology. She has no criminal history. Her work is in fact been subject to peer review. She told the Court that she does have the requisite number of hours in order to be qualified as a forensic interviewer. And specifically told the Court that Memphis Child Advocacy Center does in fact meet the requirements of Tennessee Code Annotated 9-4-213. And will not, again, put all those on the record because the record would indicate that she has in fact testified that this center does in fact meet that criteria and that it is in fact a nonprofit organization, does employ an executive director, that she has in fact graduated from an accredited university, does have a degree in psychology. She does have at least three years of psychology. She does have at least three years of full-time experience working in this field, seven years with Memphis Child Advocacy Center; that she has completed 40 hours of forensic training in interviewing child victims;

- 16 -

that she's done eight hours of interviewing under the supervision of qualified forensic interviewers; that she does have knowledge of child development through casework and professional training or experience. She has no criminal history, has participated in video review.

So the Center does meet the criteria as indicated earlier. There is a visual as well as an oral recording of this video. The entire video of the child was recorded from the time that Ms. Onry entered into this room, put preparatory remarks on the - - on the interview as to where, time, place, location that interview did in fact take place. And the tape was running even after the child had in fact been interviewed. Every voice on the recording has been properly identified. There's only two voices on this videotape, audiotape. That's Teresa Onry and [the victim]. There are no other voices or no other folks that are recorded on this video.

And this Court does find that that part of the criteria has in fact been met.

This Court also finds for the record, the Court did administer an oath to [the victim] pursuant to Tennessee Rules of Evidence 6-0-3. And 6-0-3 would indicate that before a witness is testifying that every witness shall be required to declare that the witness will testify truthfully by oath or affirmation, administered in a form calculated to awaken the witness' conscience and to impress upon the witness' mind the duty and obligation to testify truthfully or untruthfully.

[The victim], seven years of age, at the time this video was made, she was four. Very articulate young lady, soft-spoken. Very energetic young child at the age of four when this interview took place. Maybe a little bit unfocused, maybe bouncing around a little bit. A lot of energy at the age of four, which is typical for a four-year-old to engage in that kind of un-bridered - - bridled, rather, energy. Typical of four years old, but also this Court finds more advanced at the age of four, very articulate, very well spoken. Did in fact convey thoughts, did answer questions clearly, did answer those questions appropriately.

There were some instances where it was obvious that she did not understand some of the questions that Ms. Onry asked. And instead of seeding, or leading that child, if Ms. Onry tried to ask questions, did not get a response, Ms. Onry did what she was supposed to have done. Did not ask leading questions, did not suggest answers, did not provide information to this child and have the child affirm or regurgitate that

- 17 -

which Ms. Onry had suggested to [the victim]. When [the victim] apparently did not understand questions, as I told [the victim] earlier this morning, if somebody asks a questions that she doesn't understand, let me know and we'll make sure we ask better questions. And when she did not understand something, Ms. Onry did what she should have done, she just moved on to another area. And in fact at one or two times on the tape told someone she didn't understand and she basically left it alone.

She is, at the age of four, and at the age of seven right now, she is a very mentally and physically mature child. It's amazing that she was able to tell Teresa Onry in December of 2013 with a clear mind, clear memory, and to relate those things clearly and without hesitation questions that she was asked and answers that she provided. This is a very precocious four-year-old child and very physically and mentally mature at the age of four.

I did not see anything on the record that would indicate that the child has any motive to testify falsely or distort these events. There's no bias, no coercion. [Defense counsel] suggests that maybe, maybe her mother may have prompted some of this. And there are some competing theories that maybe a mother or someone else should have been present while Ms. Onry conducted this interview. But that would be improper to have someone else present when this interview in being conducted because it would lead perhaps to a child maybe providing answers and making statements that the child believes would satisfy what that child has been told to do. And that's why these interviews are conducted without anybody being present.

All the time I've been on the bench I've never seen an interview, no matter what the age of the child is, conducted at the Child Advocacy Center when a parent, guardian, or some other person was present. There's only the child and the interviewer, the forensic interviewer, that are present when this interview was conducted. And that's to make sure that there's no bias, no prejudice, nothing that would indicate that somebody was coaching or suggesting or providing answers or influencing how this child responded to questions that may have been asked of this child. There's an indication that perhaps Mom might have prompted this child or someone else may have told this child what to say. Ms. Onry told the Court that when she spoke to [the victim] that she did not talk to her about that she did not talk to her about any of the alleged facts of the case, that she had been provided some contextual information from the investigators so she would know exactly what questions or direction generally, broadly, what subjects she should

discuss with this child. But Ms. Onry told the Court clearly that she did not discuss any allegations, any specifics of this until this child was in fact in this interview room and wh[]en Ms. Onry discussed this matter with this child.

There's absolutely nothing on the record that would indicate that these events that [the victim] relayed to Teresa Onry were in fact coerced or influenced or the result of anything other than what [the victim] told Teresa Onry. In fact, there's - - there's an argument made that when Teresa Onry asked [the victim], "Tell me something about you," that the child should have talked about maybe school or parents or maybe things that she liked or did not like. But she was there because somebody said, "Mama says we're going to call the police because of what your daddy did to you." She's taken in to talk to these folks, and when she asked her to "Tell me something important about you," the mind of a four-year-old says, "This is really important, my daddy was putting his cootie in my mouth and in my booty and that's what I want to tell you that's real important because that's something that should not have happened." And she told Ms. Onry that she had told her mother, [the victim] had told her mother what had happened. And this is the narrative that she gave Ms. Onry some eight days after these events had allegedly occurred.

And I do find that that timing is in fact, eight days after this event occurred, is, as [the prosecutor] has indicated, it is unusually quick that you can have an arrangement, have the interview made at Memphis Child Advocacy Center. Unfortunately, given the nature of the cases that we handle, that are handled in Shelby County, the number of victims, it is unusual to have police officers and forensic interviewer, child, guardian, parent, all converging at one point within eight days of an outcry being made in eight days of an event having taken place. So the timing of this, the sequences of it, would indicate that these statements are in fact something that is in fact trustworthy and something that the Court does not find was a result of any distortion of any - - any influences upon this child.

The nature and duration of the alleged abuse, this child indicated that the defendant on two or three occasions, have to go back and check my notes, put his cootie in her mouth, on two different - - two or three different occasions, and he put his cootie in her booty maybe one time and only one time only. Told her two times when he put his cootie in her mouth and told her to suck it and not to bite it, twice, and that he did not put anything else in her body and nobody else had ever done

anything like this to her and that she was four years of age and that she told her mother about these events.

There's nothing that would indicate that this child has fabricated these statements. She did in fact make an outcry that was specific, that was consistent. May have been in some spots not 100 percent wholly consistent with everything that she told Ms. Onry. But given her knowledge, her experience, her age, there's nothing that would indicate that what she told Ms. Onry was in fact fabricated. Now, she did tell Ms. Onry that the defendant did put a mark on her face. Indicated at one point that her mom may have told her that. But also indicated that when she told her mom about the defendant doing this, that is something that Daddy did, that "I told my mom Daddy put his cootie in my mouth and he put a mark on my face. And I told - - he told me to do this and that and to suck it." That is what I heard on the video that she told her mom. And she may have indicated at some point that her mom told her that Dad put that mark on her face, but she told her mother that her father put this mark on the face. And he did not know how that mark was in fact put on her face. Told me, told Ms. Onry in that video, that this happened when she was alone with her brother . . . and her mom would be at work or at the store. And - - at work, rather. And when her father went to the store, that's when she made this outcry to her mother.

These statements are spontaneous. They are directly responsive to questions. There's nothing about Ms. Onry's interview that would indicate that these are leading questions or that Ms. Onry told this child what to say. There's nothing that would indicate that anyone else told this child what to say because there's no one else present. And this child is making spontaneous statements in response to questions that are asked of her.

This Court finds that this interview was reliably conducted; that the answers were in fact reliable, not the result of any leading questions. I have nothing before me, based on what I reviewed, the videotape did not get into specifics of the child testimony, and obviously the State is not required to prove their whole case in a motion to determine the admissibility of this forensic interview. State is not required to put on their whole case and say, "Judge Coffee, this is what we have."

So I have no extrinsic proof. And even most cases involving child victims, it is very unusual, it is not normal, it is very seldom, almost unheard of, for there to be trauma to a child. Whether it is vaginal, anal, or oral penetration allegedly, it is unusual that extrinsic proof through

- 20 -

any medical findings would come to court and say, "Judge Coffee, we have proof that this child was in fact traumatized anally, digitally, orally." It is something that you almost never see. And what I've been told for 33, 34 years of practicing law that it is the - - not the norm. It is in fact the norm for there to be no other extrinsic proof that says there's some physical proof that corroborates what this child has said. In fact, it is almost never a situation where a child who's been a victim of an alleged sexual assault, rape, or aggravated sexual battery, it's almost unheard of that there is some extrinsic proof that would indicate that that is corroborated by some other physical factors.

So I have nothing before the Court at all that would indicate whether there is or is not any extrinsic physical proof. But I anticipate that probably there will not be. Because that is what happens in almost all cases.

This is the father of this child. The equipment that was used in the case was in fact capable of making a video, did make an accurate recording. There is a time/date stamp that was continuously running while this video was in fact made. And this Court does find that the video was in fact accurate, was made accurately. Ms. Onry and [the victim] both told the Court that they viewed the video. Ms. Onry had indicated it's been a while. [The victim] viewed this video yesterday and indicated that the video is in fact the video that she gave to Ms. Onry.

This is - - our Supreme Court, our Court of Criminal Appeals have determined that if a child is 13 years or younger, pursuant to this factor, 24-7-123, that the videotape is in fact admissible if the Court makes the following findings, the proceeding findings, which I have in fact made. This is a seven-year-old child at this time. Was four years old at the time that this video was made. And those questions regarding possibly credibility issues, possibly issues where [the victim] may have been confused, possible issues as to whether she may have said some things that were to whether she may have said some things that were not 100 percent internally consistent, those are things that go not to the admissibility of the video. But it goes to the weight. It goes to the weight as to what weight the jury will give the videotape. And the argument that it might be prejudicial because it might inflame the jury to see a videotape recording of what this child claims might have happened, the Court is being asked basically to tell the Supreme Court and to tell our legislature that the statute is unconstitutional. And that's been decided against [Defendant]. And this Court had to indulge every presumption that a statute, an act of out legislature, is in fact a

- 21 -

constitutional act. And I'm loathe [sic], I'm very slow. I know it's been done by another judge in this jurisdiction, but I don't know and would not normally ever tell the Supreme Court and our legislature that they've passed a statute which I believe to be unconstitutional. And I am required to believe and to find that every act of the legislature is in fact constitutional.

And this Court does find, because that issue has been addressed, had been resolved against [Defendant], this Court does find none of the law of the case doctrine, if our appellate courts has established precedence [sic], I'm required to follow the precedence [sic] that's been established unless the Court finds that the act or the statute or appellate rules are clearly erroneous, that there's been a change in the law since the courts have repeatedly held these child forensic interviews are in fact admissible or unless I find that manifest injustice would result if I allow prior rulings to stand. And I find none of those apply in this instance.

And State versus Joyner, J-O-Y-N-E-R, 759 S.W.2d page 422, again would indicate that the Court must look at every statute with the presumption that an act of the General Assembly is in fact constitutional.

And this Court finds that all the prerequisites of Tennessee Code Annotated 9-4-213 and 24-7-123 have been complied with in this case. And any other objections regarding the contents of the video are not really questions that go to admissibility as to whether or not the statute's constitutional and whether or not these mandatory requirements have been met. Those other arguments go to the weight as to what the jury wants to give the contents of the video. It goes to the weight as to whether or not a jury wants to believe what the child will say in court and what she has said on that video.

And for all of those reasons, the Court will grant the State's motion to admit the forensic interview of [the victim], finding that the statute had in fact been complied with. And will deny the competing motion to exclude or to suppress the recorded interview for those reasons I stated. And will note the exceptions for the record, [defense counsel and co-counsel].

In this case, the trial court did not abuse its discretion in finding the video of the forensic interview trustworthy. It is undisputed that the forensic interviewer met the requirements of T.C.A. § 24-7-123(b)(3). Moreover, in the pretrial hearing, the victim remembered going to the Memphis Child Advocacy Center and doing the forensic interview. She also remembered the events that she talked about in the video, and she

- 22 -

said that she was telling the truth during the interview. The victim was available for cross-examination. The victim's statements in the video were consistent with what she had told her mother and what she told Ms. Discenza at the Rape Crisis Center. Ms. Discenza recounted the following:

> Child interviewed alone. SANE [Sexual Assult Nurse Examiner] asked [the victim] what happened to her eye. [The victim] stated "My Daddy hit me." "He put his thing in my mouth and told me to suck on it" (Clarified his Cootie, his private part). "He told me do this too (child demonstrated holding something in her hand and she moved her hand up and down). "He put his cootie on my butt, there was blood on the tissue." SANE asked [the victim] if her father had done this to her before? [The victim] stated, "Yes," SANE asked how many times her father has done this to her? [The victim] stated, "Three."

The video-taped interview at the Memphis Child Advocacy Center occurred eight days later, and the victim recounted the same version of events. Defendant points to several places in the video which he submits in support of his argument that the video lacks trustworthiness. However, we see nothing on the video that indicates that the victim made up her story or that she was coached into saying anything by her mother. We also do not see any alleged inconsistencies during the interview that would render it untrustworthy. As noted by the trial court, the victim behaved in a manner expected of a four-year-old child. The trial court also pointed out, and we agree, that the victim gave no sign of being intimidated by her surroundings during the interview. Accordingly, the video of the forensic interview possessed the requisite trustworthiness for admission into evidence.

Defendant also contends that it was error to admit the video because he was denied his right to confront the victim due to her age and unwillingness to discuss the details of the alleged incident at trial. *See* T.C.A. § 24-7-123(b)(1). However, we agree with the State that Defendant has waived this issue. Immediately following the victim's testimony, the State rested its case. Defendant then moved for a judgment of acquittal. At that point, Defendant raised no complaint about being denied the right to confront the victim, and he did not request that the victim's testimony and the video be stricken from the record. At the conclusion of all the proof, Defendant renewed his motion for acquittal and again raised no complaint. Therefore, this issue is waived. Tenn. R. App. P. 36(a); *State v. Thompson*, 36 S.W.3d 102, 108 (Tenn. Crim. App. 2000) ("This court is extremely hesitant to put a trial court in error where its alleged shortcoming has not been the subject of a contemporaneous objection. Indeed, we are not required to grant relief to 'a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.'") (internal citation omitted); *State v. Eric Milon*, No. W2016-01707-CCA-R3-CD, 2017 WL 4739527, at *4 (Tenn.

Crim. App. Oct. 19, 2017) (confrontation issue was waived by not having specifically objected to the admission of testimony on this ground).

Moreover, there was no denial of Defendant's right to confront the victim. As pointed out by the State, the victim answered every question asked by Defendant on cross-examination, which was approximately one-hundred and twenty-three questions. The victim also answered Defendant's questions about whether she was only testifying against him to avoid being punished, which was the crux of the defense. The victim never left the witness stand. We acknowledge that the victim stated that she could not remember what she told her mother or Ms. Discenza; however, the victim had testified as to these matters on direct examination. The victim responded to Defendant's questions regarding whether she based her testimony solely on the video of the forensic interview and whether she was merely repeating her testimony to avoid being punished. Therefore, Defendant had the opportunity to "bring out such matters as the witness' bias, . . . lack of care and attentiveness, . . . poor eyesight, and even (what is often a prime objective of cross-examination) . . . the very fact that [she] has a bad memory." *United States v. Owens*, 484 U.S. 554, 558 (1998). Defendant is not entitled to relief on this issue.

## II. Sufficiency of the Evidence

Defendant contends that the evidence was insufficient to support his convictions for rape of a child, aggravated sexual battery, and misdemeanor child abuse. The standard for appellate review of a claim challenging the sufficiency of the State's evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011). To obtain relief on a claim of insufficient evidence, appellant must demonstrate that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319. This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

On appellate review, "'we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom.'" *Davis*, 354 S.W.3d at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)); *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). In a jury trial, questions involving the credibility of witnesses and the weight and value to be given the evidence, as well as all factual disputes raised by the evidence, are resolved by the jury as trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). This court presumes that the jury has afforded the State all reasonable inferences from the evidence and resolved all conflicts in the testimony in favor of the State; as such, we will

not substitute our own inferences drawn from the evidence for those drawn by the jury, nor will we re-weigh or re-evaluate the evidence. *Dorantes*, 331 S.W.3d at 379; *Cabbage*, 571 S.W.2d at 835; *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984). Because a jury conviction removes the presumption of innocence that appellant enjoyed at trial and replaces it with one of guilt at the appellate level, the burden of proof shifts from the State to the convicted appellant, who must demonstrate to this court that the evidence is insufficient to support the jury's findings. *Davis*, 354 S.W.3d at 729 (citing *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)).

To establish rape of a child, the State was required to prove "unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if such victim is less than thirteen years of age." Tenn. Code Ann. § 39-13-522(a). Sexual penetration is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body . . . ." *Id.* § 39-13-501(7).

To establish aggravated sexual battery, the State was required to prove "unlawful sexual contact with a victim by the defendant" when the victim is less than thirteen years old. *Id.* § 39-13-504(a)(4). "Sexual contact" is "the intentional touching of the victim's . . . intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's, the defendant's, or any other person's intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." *Id.* § 39-13-501(6). "'Intimate parts' includes the primary genital area, groin, inner thigh, buttock or breast of a human being." *Id.* § 39-13-501(2).

Child abuse is defined as "knowingly, other than by accidental means, treat[ing] a child under eighteen (18) years of age in such a manner as to inflict injury[.]" *Id*. § 39-15-401(a). Child neglect is "knowingly abus[ing] or neglect[ing] a child under eighteen (18) years of age, so as to adversely affect the child's health and welfare[.]" *Id*. § 39-15-401(b).

In this case, Defendant argues that the evidence was insufficient to support his convictions because the videotape of the victim's forensic interview was improperly admitted and that without the video, "the State is left with virtually nothing proving the elements of the three offenses of which the Defendant was convicted beyond a reasonable doubt."

Before reviewing the evidence presented at trial, it is important to note that when an appellate court reviews whether the evidence admitted is legally sufficient to support a conviction, *all* evidence is reviewed, even evidence that the court determines was inadmissible. *State v. Longstreet*, 619 S.W.2d 97, 100-01 (Tenn. 1981). This is true even if the reason the evidence was erroneously admitted is the result of the denial of a

defendant's constitutional rights which results in a reversal of the conviction and granting a new trial. Furthermore, it applies when the conviction is reversed because of trial proceedings in violation of an accused's constitutional rights, as in this case. We conclude that structural constitutional error occurred during the victim's testimony which necessitates a new trial. However, the victim's testimony must still be considered when making a legal sufficiency of the evidence determination. A determination that all the evidence admitted is insufficient to support the conviction results in a reversal of the conviction and dismissal of the charge with prejudice with no new trial due to double jeopardy implications. Therefore, finding legal sufficiency of the evidence to support a conviction is never inconsistent with also determining that a reversal with a new trial is mandated on other grounds.

As we have previously determined, the video of the forensic interview was properly admitted. We further find that the evidence presented at trial was sufficient beyond a reasonable doubt to support Defendant's convictions. As pointed out by the State, the victim, who was four years old at the time of the offenses, was consistent in her statements to her mother and everyone else that Defendant placed his penis in her mouth and anus and that he made her wrap her hands around his penis and move it up and down. The victim's trial testimony was also consistent with what she told Ms. Onry during the forensic interview.

C.D., the victim's mother, testified that Defendant was not acting normally when she arrived home from work and that he then left the residence to walk to a store. He had also told the children to stay in their rooms. When the victim came out of her room, C.D. noticed a bruise under her eye, and the victim said that Defendant did it. The victim told C.D. that Defendant put his "cootie" in her mouth and told her not to bite it, and he told her to move her hands up and down on his penis and suck on it. The victim went to the bathroom and told C.D. that there was "red stuff" on the tissue. C.D. saw a "pinkish red" substance in the toilet.

Although there was no physical evidence of the offense, other than the bruise under the victim's eye, Ms. Discenza testified that the lack of injury to the victim's genital or anal area was not uncommon in cases of child sexual assault. She further testified that the bleeding noticed by the victim could have occurred internally and not been visible from the exam. Ms. Discenza also noted that the anal area, especially, had an "autonomic response that it will dilate up" to prevent injury. Ms. Discenza testified that the victim had eaten food prior to her examination, and she had a bowel movement with diarrhea. Therefore, she was not surprised that no DNA was found on the oral or anal swabs taken from the victim. Ms. Discenza testified that her findings supported the victim's history of sexual assault.

Defendant further argues that the rule of cancellation applies in this case "cancelling out [the victim's] statements as to the crimes, leaving the remaining evidence

insufficient to convict Defendant." Concerning the rule of cancellation, a panel of this court has held:

> The court in [*State v. Matthews*, 888 S.W.2d 446, 449 (Tenn. Crim. App. 1993)] recognized that "contradictory [sworn] statements by a witness in connection with the same fact cancel each other." 888 S.W.2d at 449 (citing *Taylor v. Nashville Banner Pub. Co.*, 573 S.W.2d 476, 482 (Tenn. Crim. App. 1978)); *see State v. Cayle Wayne Harris*, No. M2000-02143-CCA-R3-CD, 2001 WL 1218582, at *2 (Tenn. Crim. App. Oct. 12, 2001) ("The rule of cancellation is typically limited to circumstances in which the witness has sworn to each statement."). The *Matthews* court explained that unlike a scenario in which the jury hears contradictory testimony from two different witnesses and must make a credibility determination, a witness's self-contradicting testimony means that each version carries equal weight and cannot be resolved by the jury except through whimsy. *Matthews*, 888 S.W.2d at 449-50 (citing *Johnston v. Cincinnati N.O. & T.P. Ry. Co.*, 240 S.W. 429, 436 (Tenn. 1922)). The rule of cancellation applies when "inconsistency in a witness'[s] testimony is unexplained and when neither version of his testimony is corroborated by other evidence." *Id*. at 450 (citing *Taylor*, 573 S.W.2d at 483). Testimony from a single witness will be disregarded when the testimony "is not of a cogent and conclusive nature, and 'if it is so indefinite, contradictory or unreliable that it would be unsafe to rest a conviction thereon.'" *Letner v. State*, 512 S.W.2d 643, 649 (Tenn. Crim. App. 1974) (quoting 23 C.J.S. *Criminal Law* § 903).

*State v. David Hopkins*, No. E2016-02192-CCA-R3-CD, 2017 WL 4221148, at *7 (Tenn. Crim. App. Sept. 22, 2017). Contrary to Defendant's assertions, the victim did not give contradictory sworn statements. The victim's only sworn testimony detailing the offenses was given by her at the trial. Although the victim testified at the pretrial hearing concerning the admission of the forensic interview video, she merely authenticated the video and affirmed that she was telling the truth in it. Additionally, we do not find that the four-year-old victim's statements during the forensic interview were sworn statements. Therefore, there is no conflicting sworn testimony as alleged by Defendant. *Id*. at *7 ("Although Sutton gave unsworn, contradictory statements to the police prior to Hopkins' trial, she provided consistent testimony at trial implicating Hopkins in the victim's killing and robbery. Because Sutton did not provide conflicting sworn testimony, we do not believe the rule of cancellation applies, and we may consider her testimony when evaluating the sufficiency of the evidence."). Because the victim did not provide conflicting sworn testimony, we do not believe that the rule of cancellation applies in this case.

We also note that the victim's trial testimony was consistent with her statements in the video of the forensic interview. There is nothing about the victim's testimony that is so unreliable as to justify its exclusion. A single witness' testimony will only be disregarded if it "is not of a cogent and conclusive nature, and 'if it is so indefinite, contradictory or unreliable that it would be unsafe to rest a conviction thereon.'" *Letner*, 512 S.W.2d at 649 (citation omitted). The victim's statements about oral and anal penetration and finding blood on the toilet tissue were consistent throughout the proceedings and corroborated by her mother's testimony.

The evidence was sufficient beyond a reasonable doubt to support Defendant's convictions for rape of a child, aggravated sexual battery, and misdemeanor child abuse. Defendant is not entitled to relief on this issue.

### III.  Denial of Request to Review the Victim's Medical Records

Defendant argues that the trial court erred in refusing him access to the victim's medical records. At trial, defense counsel indicated that he had subpoenaed the victim's medical records from Le Bonheur Children's Hospital. The hospital sent the records to the trial court under seal, and the trial judge reviewed them.

Defendant requested to review the victim's medical records that were in the possession of the trial court speculating that the records might contain exculpatory information and to "get the names of people, the doctors, nurses, stuff to try to see if [they] couldn't question them or get them in here at trial to see if there's something they could add." The trial court noted that it had reviewed the medical records *in camera*. The trial court denied Defendant's request to review the medical records.

We are unable to conclude whether the trial court abused its discretion when it declined to disclose the victim's medical records to Defendant. There are no sealed medical records included in the appellate record for this court to review. It is the duty of an appellant to make sure the appellate record contains everything necessary for this Court to review properly raised issues. Tenn. R. App. P. 24(b). Without the sealed medical records, we are unable to review this issue. *Thompson v. State*, 868 S.W.2d 156, 172 (Tenn. Crim. App. 1993). Accordingly, the issue is waived. *State v. Oody*, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991).

### IV.  Failure to Give a *Ferguson* Instruction

Defendant contends that the trial court erred by declining to give the jury a *Ferguson* instruction because the victim's underwear was not collected and preserved as evidence. In *State v. Ferguson*, the Tennessee Supreme Court held that "the loss or destruction of potentially exculpatory evidence may violate a defendant's right to a fair trial." *State v. Merriman*, 410 S.W.3d 779, 784 (Tenn. 2013) (citing *State v. Ferguson*, 2

S.W.3d 912, 915-16 (Tenn. 1999)). Upon determining that the due process clause under the Tennessee Constitution was broader than the due process clause under the United States Constitution, the Tennessee Supreme Court rejected the "bad faith" analysis adopted by the United States Supreme Court which provided that "'unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.'" *Id.* at 784-85 (quoting *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988)). Rather, the court in *Ferguson* adopted a balancing approach requiring the trial court to determine "'[w]hether a trial, conducted without the [lost or] destroyed evidence, would be fundamentally fair.'" *Id.* at 785 (quoting *Ferguson*, 2 S.W.3d at 914).

When a *Ferguson* claim is raised, a trial court must first determine "whether the State had a duty to preserve the evidence." *Id.* "[T]he State's duty to preserve evidence is limited to constitutionally material evidence described as 'evidence that might be expected to play a significant role in the suspect's defense.'" *Id.* (quoting *Ferguson*, 2 S.W.3d at 917). To meet the constitutionally material evidence standard, "the evidence must potentially possess exculpatory value and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id.*

> If the proof establishes that the State had a duty to preserve the evidence and that the State failed in its duty, the court must conduct a balancing analysis, considering the following factors:
>
> 1. The degree of negligence involved;
> 2. The significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and
> 3. The sufficiency of the other evidence used at trial to support the conviction.
>
> *Ferguson*, 2 S.W.3d at 917 (footnote omitted). The trial court must balance these factors to determine whether a trial would be fundamentally fair absent the missing evidence. *Merriman*, 410 S.W.3d at 785. If the trial court determines that a trial would be fundamentally unfair without the missing evidence, "the trial court may then impose an appropriate remedy to protect the defendant's right to a fair trial, including, but not limited to, dismissing the charges or providing a jury instruction." *Id.* at 786.
>
> This court reviews the trial court's decision regarding the fundamental fairness of a trial conducted without the missing evidence de novo. *Id.* at 791. The trial court's findings of fact are conclusive on appeal unless

the evidence preponderates against them. *See id.* (citations omitted). This court reviews the trial court's remedy for a *Ferguson* violation under the abuse of discretion standard. *Id.*

*State v. Terry Craighead and Sinead St. Omer*, No. M2017-01085-CCA-R3-CD, 2018 WL 5994974, at *8 (Tenn. Crim. App. Nov. 15, 2018) perm. app. denied March 28, 2019. In *Craighead*, this court further said:

> In *Ferguson,* the Tennessee Supreme Court did not impose a duty upon the State to collect evidence but addressed the State's duty to preserve evidence. *See Ferguson*, 2 S.W.3d 912. *Ferguson* involved the State's failure to preserve a video recording of the defendant's performing field sobriety tests at a police station following his arrest for driving under the influence. *Id*. at 914-15. In reaching its decision, the Court in *Ferguson* discussed two opinions from the United States Supreme Court: *California v. Trombetta*, 467 U.S. 479 (1984), and *Youngblood*, 488 U.S. 51. *Trombetta* involved the State's failure to preserve samples of a defendant's breath-analysis test, and *Youngblood* addressed the police officer's failure to refrigerate semen-stained clothing collected from a sodomy victim which precluded testing of the clothing. *See Trombetta*, 467 U.S. at 481; *Youngblood*, 488 U.S. at 58. Neither case addressed the State's duty to collect the evidence but addressed the State's failure to preserve the evidence once it was collected.
>
> Our supreme court in *Ferguson* included in a footnote a jury instruction that a trial court may employ upon finding that the State's destruction of evidence violated a defendant's constitutional right to a fair trial. 2 S.W.3d at 917 n.11. The jury instruction provides in part, "The State has a duty to gather, preserve, and produce at trial evidence which may possess exculpatory evidence." *Id.* The court cited to *Trombetta* and *State v. Willits*, 393 P.2d 274, 276 (Ariz. 1964), in support of the instruction. However, neither *Trombetta* nor *Willits* addressed whether the State has a duty to collect evidence but addressed the State's failure to preserve evidence already in the State's possession. *See Trombetta*, 467 U.S. at 481; *Willits*, 393 P.2d 276-78 (holding that the trial court erred in failing to instruct the jury that if the jury determined that the State destroyed evidence whose contents or quality are at issue, the jury may infer that the evidence did not support the State's interests).
>
> On numerous occasions, this court has held that a law enforcement officer's failure to collect certain items from a crime scene did not result in a *Ferguson* violation. *See e.g., State v. Joshua Hunter Bargery*, No. W2016-00893-CCA-R3-CD, 2017 WL 4466559, at *62-64 (Tenn. Crim.

App. Oct. 6, 2017), *no perm. app. filed* (holding that the State's failure to collect a bloody towel, fruit punch cans, blood stain samples, and fingerprints did not violate *Ferguson* because the State had no duty to collect such items); *State v. Mario Hubbard*, No. W2016-01521-CCA-R3-CD, 2017 WL 2472372, at *6-8 (Tenn. Crim. App. June 7, 2017), *no perm. app. filed* (concluding that the State did not have a duty to preserve surveillance footage from a crime scene when officers failed to collect the footage); *State v. Cordell Bufford*, No. W2013-00841-CCA-R3-CD, 2014 WL 2129526, at *12-13 (Tenn. Crim. App. May 20, 2014) (rejecting the defendant's claim that "the State should have collected more evidence because that evidence *might have been* exculpatory" (emphasis in original)); *State v. Brock*, 327 S.W.3d 645, 698-99 (Tenn. Crim. App. 2009) (holding that the State did not have a duty to collect fingerprint evidence and a bloody footprint from the crime scene); *State v. Yevette Somerville*, No. W2001-00902-CCA-R3-CD, 2002 WL 1482730, at *4-5 (Tenn. Crim. App. Feb. 11, 2002) (concluding that the State did not have a duty to preserve surveillance footage from the scene of a Wal-Mart for a shoplifting charge when the State never had possession or control over the footage).

In concluding that the State's failure to collect evidence from a crime scene does not rise to the level of a *Ferguson* violation, this court has recognized that

> "the State is not required to investigate cases in any particular way: Due process does not require the police to conduct a particular type of investigation. Rather, the reliability of the evidence gathered by the police is tested in the crucible of a trial at which the defendant receives due process. Moreover, [i]t is not the duty of this Court to pass judgment regarding the investigative techniques used by law enforcement unless they violate specific statutory or constitutional mandates."

*Brock*, 327 S.W.3d at 698-99 (quoting *State v. Tony Best*, No. E2007-00296-CCA-R3-CD, 2008 WL 4367529, at *13 (Tenn. Crim. App. Sept. 25, 2008)) (internal citations omitted).

*State v. Terry Craighead and Sinead St. Omer,* 2018 WL 5994974, at *9-10.

In this case, the trial court properly declined to give the jury a *Ferguson* instruction because the victim's underwear was not lost, and the State had no duty to collect and preserve the victim's underwear. Defendant is not entitled to relief on this issue.

- 31 -

## V.    Extraneous Prejudicial Information

Defendant essentially argues that a juror's two questions amounted to extraneous prejudicial information and that he was entitled to a mistrial because the trial court did not allow him to cross-examine the victim's mother concerning the questions asked. The trial court informed counsel that it would not publish the two questions to the jury and would not ask the victim's mother about them because the questions were "not relevant to anything that this jury has to determine." The two questions asked by the juror were: (1) why the victim's mother had a one-year-old daughter after the victim had alleged that she was raped by Defendant; and (2) was the one-year-old child the product of a consensual relationship or did Defendant rape the victim's mother. At that point, Defendant raised no objection, did not request a mistrial, nor did he request a jury-out hearing for a proffer from the victim's mother. We agree with the State that the issue is waived because the Defendant did not raise the issue during trial. *See* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.").

Furthermore, the trial court notified the jury that it had received a question that it could not answer. The court further instructed the jury that if submitted questions were not answered by the proof, "you cannot guess, cannot speculate, cannot consider for any reason at all, any purpose at all, the answer or guess what the answer might have been had an answer been provided." Defendant voiced no objection to the instruction, and the jury is presumed to have obeyed the instruction of the trial court. *See State v. Banks*, 271 S.W.3d 90, 134 (Tenn. 2008). We also find that the juror's questions did not amount to extraneous information.

> "[I]nformation that can be inferred from the evidence offered at trial is not extraneous information." [*State v.*]*Crenshaw*, 64 S.W.3d [374,] 393 [(Tenn. Crim. App. 2001)]. Nor are "a juror's subjective thoughts, fears, and emotions" considered extraneous information. *Caldararo ex rel. Caldararo v. Vanderbilt Univ.*, 794 S.W.2d 738, 742 (Tenn. Crim. App. 1990). Likewise, "[i]ntra-jury pressure or intimidation are 'internal matters that do not involve extraneous information or outside influence.'" [*State v. David Brian*] *Howard*, 2017 WL 4051134, at *10[(Tenn. Crim. App. Sept.13, 2017)] (quoting *Caldararo*, 794 S.W.2d at 742). As such, the Defendant has failed to establish that the opinion expressed in the juror question as well as the potential impact that opinion had on the other jurors amounted to extraneous prejudicial information.

- 32 -

*State v. Timothy Pate*, No. E2016-02566-CCA-R3-CD, 2018 WL 4026500, at \*15 (Tenn. Crim. App. June 29, 2018), *appeal denied* (Nov. 15, 2018). At trial in this case, the victim's mother testified on direct examination that she had three children by Defendant ages seven, four and one year old. On continued direct examination by the State, the victim's mother testified that she found out approximately one month after the offenses in this case that she was pregnant with her third child who was now within a couple of weeks of turning two years old. Therefore, the two questions were apparently based on information inferred from trial and were not extraneous prejudicial information.

Defendant is not entitled to relief on this issue.

## VI.    Sentencing

Defendant contends that the trial court improperly considered sentencing factors. From his argument, it appears that Defendant only challenges the length of his forty-year sentence for rape of a child. He does not appear to challenge the trial court's imposition of consecutive sentences.

Our standard of review of the trial court's sentencing determinations is whether the trial court abused its discretion, and we apply a "presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). The application of the purposes and principles of sentencing involves a consideration of "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant . . . in determining the sentence alternative or length of a term to be imposed." T.C.A. § 40-35-103(5). Trial courts are "required under the 2005 amendments to 'place on the record, either orally or in writing, what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing.'" *Bise*, 380 S.W.3d at 698-99 (quoting T.C.A. § 40-35-210(e)). Under the holding in *Bise*, "[a] sentence should be upheld so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709-10.

On appeal, Defendant argues that the trial court erred by erroneously stating multiple times that Defendant raped the victim "orally, anally, and vaginally." Defendant points out that there was no proof that Defendant raped the victim vaginally. Defendant further contends that the trial court improperly referenced "the fact that the [victim] in the present case had only turned four (4) years old eight (8) months prior to the alleged incidence[sic]" and that had the victim "been three (3) at the time of the incidence [sic], the range for Defendant would have been forty (40) to sixty (60) years." Defendant therefore asserts that the trial court "seemingly used this rationale for sentencing Defendant to forty (40) years, enhancing his sentence to the highest maximum sentence."

- 33 -

Although the trial court was incorrect in stating that Defendant raped the victim vaginally, this does not negate his sentence. The record reflects that the trial court, in sentencing Defendant, considered all appropriate principles set forth in T.C.A. § 40-35-210(b). The court applied four enhancement factors, including Defendant's history of criminal convictions in addition to those necessary to establish the range; the victim was particularly vulnerable due to her age; Defendant has failed to comply with conditions of a sentence involving release into the community; and Defendant abused a position of trust. *See* T.C.A. § 40-35-114(1), (4), (8), (14). The trial court gave great weight to each of the enhancement factors. The court did not find any applicable mitigating factors. Defendant does not contest the application of enhancement factors, and the record reflects that they were appropriately applied.

Defendant's conviction for rape of a child is a Class A felony. T.C.A. § 39-13-522(b)(1). Because he was convicted of rape of a child, Defendant was subject to sentencing range of twenty-five to forty years. T.C.A. § 39-13-522(2)(A); § 40-35-112(b)(1). Defendant's sentence of forty years is within the range.

We conclude that the trial court properly sentenced Defendant. The trial court considered the relevant principles and sentenced Defendant to a within range sentence. The evidence presented at trial and during the sentencing hearing supports the trial court's application of enhancement factors. We conclude the trial court did not abuse its discretion by imposing the maximum sentence of forty years for Defendant's rape of a child conviction. As such, the Defendant is not entitled to relief on this issue.

## VII. Plain Error

In a supplemental brief, Defendant raises two issues for which he seeks relief pursuant to the plain error doctrine. *See State v. Adkisson*, 899 S.W.2d 626 639-42 (Tenn. Crim. App. 1994); Tenn. R. App. P. 36(b). Specifically, Defendant asserts that he is entitled to a new trial because: (1) the trial court, over Defendant's objection, excluded the public from his trial during the victim's testimony, and (2) the trial court should have recused himself from presiding over the trial after having ex parte communications with an assistant district attorney.

*(1) Denial of Defendant's Sixth Amendment Right to a Public Trial*

On July 6, 2016, prior to the trial which began July 19, 2016, the State filed a pleading designated as "Motion of the State of Tennessee for Special Procedures During the Testimony of [the] Child Victim." Pertinent to the present issue, the motion stated, in relevant part,

NOW COMES the State of Tennessee in the above styled cause and hereby requests that the Court allow the following procedures and

- 34 -

modifications in the courtroom to be used during the child victim's testimony, due to the age of the victim and the nature of her testimony:

> 1. That the courtroom be closed to the media and all persons who are not required by law or requested by the child to be present in the courtroom during the child victim's testimony;
>
> . . . .
>
> 3. That the guardian and/or victim advocate be allowed to be present in the courtroom[.]

The motion was heard by the trial court, along with various other motions, on July 18, 2016. In order to best express exactly what transpired in the courtroom during the hearing of this motion, we will set forth excerpts from the transcript as follows.

> **[ASSISTANT DISTRICT ATTORNEY]**: Your Honor, I wanted to start by addressing motion that we filed for special procedures during the testimony of a child victim. The first is that the courtroom be closed to media and all persons who are not required by the law or requested by the child to be present in the courtroom during the child victim's testimony only. Your Honor, we'd ask that that be something that the Court will implement both at this hearing and also during the trial. She's seven years old now, for the record. She is extremely shy and reluctant to testify in front of people she doesn't know. And, Your Honor, there are many people currently in the courtroom. And I understand that these are normally open proceedings. They can be present for every other part of the trial. But in light of the victim's age and information that she has to talk about, questions that she'll be asked by both the State and the defense, I think it's appropriate that there be as few people in the courtroom as possible both to ensure that she can testify without undue influence but also so she is available for cross-examination.
>
> Your Honor, as to No. 2, that the child victim be able to bring in a comfort item, such as a stuffed animal, I think that she'll have a stuffed animal with her if the Court permits that. Also, that her guardian be allowed to be present in the courtroom. Her mother is a person of comfort to her, and we would ask that she be able to be present at this hearing and during the trial. She'll testify before her so that there shouldn't be any issues with the rule. But we would ask that she be able to be in the courtroom and possibly even be able to sit near the victim to provide comfort to her. Courts have allowed that before. The child could even sit in the guardian's lap or even in a prosecutor's lap.

They've allowed that before. We would just ask that she be able to sit near her.

. . . .

**THE COURT:** [Defense Counsel], the motion filed by [Assistant District Attorneys] regarding special procedures for the testimony of the child victim, any statements or arguments regarding the requests that have been placed on the record?

**[DEFENSE COUNSEL]**: Your Honor, as far as the courtroom being cleared, we understand that with exception this is my client's family. We feel they have a right to be in the courtroom as long as they behave themselves appropriately. They're also related to her.

**THE COURT**: [Defense Counsel], there are areas - - and your client obviously has the right to be present during all critical stages of the trial. And courtrooms are normally open to the public unless the Court finds a reason as to why it should not be open. I have not seen the seven-year-old child in this case, but the trends in federal courts, state courts, not only in Tennessee but other courts, are to allow special procedural accommodations for child witnesses in a deference. Basically it falls in the sound discretion of the trial court as to whether or not the Court should grant certain special accommodations and special procedures. And the Court of Criminal Appeals would look at it, appellate courts would look at it as to an abuse of discretion as to whether or not by imposing certain restrictions, whether the Court has abused its discretion.

And what I'm told is that the child is very sensitive, very, very uncomfortable. And this is a situation where your client has a right to be present. Other court personnel has to be present while the trial is being conducted. But his family members, I don't know that they're necessary witnesses or any reasons why the Court should say that those folks should be allowed to be present when I'm told that the victim, alleged victim, witness would be very uncomfortable in looking at certain people while she is testifying.

So I don't know how - - you have to articulate or tell me why it somehow is prejudicial to [Defendant] if his family and other members are not allowed to be present in court when that child is in fact testifying. There are some states, some states, Tennessee right now is not one of those states, that would allow a child victim to testify in a different room. Doesn't even have to be in the courtroom. Testify by way of

- 36 -

closed circuit TV. And our courts have held it is not a violation of a defendant's rights to confrontation if the defendant is in the courtroom, the victim is testifying in another room, because the defendant's able to see the child on video screens while that child is testifying. So there are courts, other states, and it has been used in other courts in this state, I believe, where a child is allowed to testify not having to sit in the witness stand, not having to face anyone, but testifying by way of the closed circuit TV.

[Defendant] has a right to be present. And if that could also be done by - - we don't have the ability in Shelby County at this moment to do closed circuit television testimony of any witnesses. But he has the right to be present. [The] State is not asking that your client be excused or excluded, or lawyers, but just simply other folks. And I do not find that that request is any - - at all prejudicial to [Defendant], does not impede his ability to get a fair trial in this case. And again, it's something that's within the sound discretion of the courts. And the trend nationwide is for the court to adopt those special accommodations for child witnesses. And allowing this child to testify without having to look at a courtroom full of strangers to go through something that is probably the worst thing that hopefully that child will ever go through in her life, I don't think that is at all prejudicial of [Defendant] to tell other folks, visitors, not only his family members, but any other folks that may be present in the courtroom that while this child is testifying - - [Defendant] has the right to confront, has a right to be present during all the questioning of this victim.

But there are no - - nothing in the Constitution that says other people have the right to be present. There's nothing in our rules that would indicate that other members of the general public and/or media has the right to be present. The media has not, for the record, filed any request asking that this case be covered, none that has been filed, none that's been presented. We did have the media here on another case this morning, but not related to [Defendant] but a first-degree murder case.

And I do find that the request to allow this victim to testify and not have other folks present in the courtroom not only during this hearing but also during her testimony, I do find that it is well taken, find that the probative value, that there is no unfair prejudice that could be absolutely associated with this by saying that the other members of the public will not be able to be present in the courtroom when this child is testifying. And this is to protect the child. This is also to protect the integrity of [Defendant's] trial. And I don't want this alleged victim to take the

- 37 -

witness stand and feel that she is being pressured one way or the other to say anything, influenced one way or the other because of other folks that may be present in the courtroom.

So I will grant the State's request when this child is testifying to exclude all other unnecessary, legally unnecessary people from the courtroom. That's everybody other than the court staff, the deputies, the lawyers, and [Defendant]. But - - and any other support staff that this child may deem to be necessary. There is no other reason for anybody else to be present in the courtroom, and will grant the State's request for that special accommodation, a procedural accommodation, is to allow this child to testify without any, any inferences or any possibilities of any influences, either positive or negative, that might be received if she's having to testify and other folks be present in the courtroom. Will note the exception for the record, but I do believe it is well taken. The Court in its sound exercise of its discretion believes that motion is in fact well taken and will allow this child to testify without other folks being present in the courtroom necessarily.

Yes, sir?

**[DEFENSE COUNSEL]**: Your Honor, you specifically said positive or negative. She's going to have - -

**THE COURT:** And let me restructure that, and thank you.

**[DEFENSE COUNSEL]**: But if you're letting her mother here, that's a positive - -

**THE COURT:** Let me restructure that. I'll restate that, because part of the motion that [Assistant District Attorney] has filed is asking the Court to allow a person, mother or someone else, to be present when the child is testifying. And pursuant to Rule 615, the Court, at the request of a party, shall order witnesses to be excluded from the courtroom, but the rule does not authorize the exclusion of a party who is a natural person, a person designated by counsel, other party that is not an actual person, or person who's present is shown by a party to be essential to the presentation of the party's cause. And [Assistant District Attorney] is indicating that the child's mother is in fact a person who is essential, that is somebody that provides support to that child.

. . . .

- 38 -

And will qualify that because I did misspeak, [Defense Counsel], that I will exempt the victim's mother from the Rule of Sequestration pursuant to Jordan [sic] and pursuant to Rule 615 and would allow the victim's mother to be present in the courtroom while her child is in fact testifying.

[Defense Counsel]?

**[DEFENSE COUNSEL]**:     Your Honor?

**THE COURT:**  Yes, sir?

**[DEFENSE COUNSEL]**:     To make it clear, none of my client's family are allowed to be here during - -

**THE COURT:**  The testimony of the child.  Of the child.  Only the child.

**[DEFENSE COUNSEL]**:     - - the testimony of the child.

**THE COURT:**  Yes, sir.

**[DEFENSE COUNSEL]**:     And they're not allowed to stay here for this hearing.

**THE COURT:**  Not for this hearing while the child is testifying, that's true.

**[DEFENSE COUNSEL]**:     Even his mother?  We couldn't compromise and have my client's mother?

**THE COURT:**  No, sir.

**[DEFENSE COUNSEL]**:     Some of these people won't be here anyway because they're just - - they're actually going to testify at the trial.

**THE COURT:** [Defendant] has certain rights, [Defense Counsel].  He has the right to be present during all critical stages of the proceedings.  I don't know of anything under Tennessee law that indicates that family members have a right to be present when the Court has ruled, as I have in this case, that the Court will in fact make those accommodations, which the courts across the country have made.  And

- 39 -

again, that's the Court of Criminal Appeals indicates it's within - - the Supreme Court - - it's within the sound discretion of the trial court. And I do find, as indicated earlier, that the motion by the State in which they're asking the Court to allow this courtroom to be void of any pressures, any - - any outside influences, that it is within the sound discretion of the trial court to allow those procedural accommodations for child witnesses. And that is the trend not only in this state but nationwide. And the courts have indicated that the trial court's decision on how to structure its own procedures will not be disturbed unless it is in fact a clear abuse of discretion.

So I'm finding that there is nothing in Tennessee or federal law that would indicate that a defendant's family members have a right to be present at all stages of the trial and have a right to be present when all witnesses are testifying. And I do find that the motion for the State is in fact well taken. It is not prejudicial to [Defendant] at all to not have his family members present in court when a seven-year-old child who's at the age of - - this offense I believe is 2013, if I remember the indictment correctly. This child would have been three or four, four years of age when this allegedly occurred. And it is not prejudicial to [Defendant]. December 6, 2013 through December 8, some three years ago. The child is now seven, would have been four at the time this offense allegedly occurred. Is not prejudicial at all to [Defendant] to tell him that his family members cannot be present in court when that child, alleged child victim, is in fact testifying. So probative value, and to say, "I want my family here when all people testify" is just simply not a right that he has. He has a right to be present himself, does not have a right to say, "Judge Coffee, I want family members present."

I, again, will note the exception for the exception for the record but will grant the State's request that when this child is testifying, either in this hearing or at trial, that they will not be allowed to be present in court unless they're shown to be necessary parties to this lawsuit or necessary witness pursuant to [Rule] 615 . . . . Otherwise, all other folks will be excluded from this courtroom. And that other than the lawyers, the defendant, court personnel, and the child and any other folks that would be excluded pursuant to Rule 615, everyone else will in fact be excluded.

[DEFENSE COUNSEL]: But they're allowed to be here at all other times?

THE COURT: Yes, sir, absolutely.

**[DEFENSE COUNSEL]**:    So they're allowed to be present at all times other than while the child is testifying?

**THE COURT:** Absolutely.  Yes, sir.

At the conclusion of additional motions in limine heard on the first day of trial, prior to testimony of the State's first witness (the victim's mother), the trial court reiterated its prior ruling for the courtroom to be cleared during the victim's testimony. The trial court stated,

> **THE COURT:**  I have no idea the order in which the State intends to put their proof on, but when the child is called as a witness, as indicated Monday, all parties that are not necessary, [Defendant], lawyers, court personnel, support personnel the Court has excluded from the rule, once the child is called or before the child is called as a witness, the courtroom will be cleared of all folks that are not necessary to be in court when the child is in fact called to testify.

Just prior to the victim being called as a witness, the following exchange transpired:

> **THE COURT:**  Anything else we need to address before we bring in the jury?
>
> **[ASSISTANT DISTRICT ATTORNEY]**: Your Honor, would it be okay if we went ahead and brought the victim and her family in here so we don't have to go get them while the jury's coming in.
>
> **THE COURT**: Yes, ma'am.  Ask her to step in, please - -
>
> **[DEFENSE COUNSEL]**:    I thought she only asked for the victim's mother.
>
> **THE COURT:**  I'm sorry?
>
> **[DEFENSE COUNSEL]**:    I thought they asked at the hearing for the victim's mother to be here.  That's all you approved for them to have if they're making all the defendant's family be out of the courtroom.
>
> **THE COURT:**  [Defense counsel], I don't know what - - what other family members or court members the State wants to have in court for this child.  Whether it's the mother or two people or three people, the rulings are the same.  As I indicated earlier, the Court has to make those

- 41 -

reasonable accommodations. It's not prejudicial to [Defendant]. It is not harmful to [Defendant]. And again, there's absolutely nothing under the law that says that [Defendant] has a right to have his family members here. And in fact creates - - it creates an oppressive environment. It could create a coercive environment. It could create a threatening environment if that child is sitting there on the witness stand looking at folks that are and were her relatives, people that she's probably spent time at their house, maybe spent overnight at their house, and have to look at them and say "This is what my daddy did to me." And that's something that's just - - this Court will not permit in this courtroom. And I've indicated that his family can be here for everything other than this child's testimony.

For the record, there are three [sic] people that just walked into the courtroom. [The victim], her mother, and two other people.

The Sixth Amendment to the Constitution of the United States, made applicable to the various individual states by the Fourteenth Amendment to the Constitution, states in pertinent part that, "In **all** criminal prosecutions, the **accused** shall enjoy the right to a speedy and **public trial**." (emphasis added). Similarly, the Constitution of Tennessee, Article I, section 9, provides in pertinent part, "That in **all** criminal prosecutions, the **accused** hath the right to . . . a speedy **public trial.**" (emphasis added). We initially note that the issue in the case *sub judice* involves only Defendant's right to a public trial pursuant to the above quoted requirements of the Constitutions of the United States and Tennessee.

A strict interpretation of these provisions in the United States Constitution and in the Constitution of Tennessee would necessarily conclude that there are no exceptions to a criminal defendant's right to a public trial. However, as with several constitutional rights, courts of last resort have written exceptions to the criminal defendant's right to a public trial. *See Waller v. Georgia*, 467 U.S. 39 (1984).

This issue presented by Defendant *does not* involve the constitutional rights of the public and/or the media to be present at trial proceedings pursuant to "a qualified *First Amendment right* to attend a criminal trial." *Waller*, 467 U.S. at 44. (citing *Globe Newspaper Co. v. Superior Court for Norfolk County*, 457 U.S. 596 (1982) and *Richard Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980)). (emphasis added).

It is important to emphasize the following quote from *Waller* as it pertains to the issue presented by Defendant. The Supreme Court's unanimous opinion states:

As noted, the analysis in these cases has proceeded largely under the First Amendment. Nevertheless, there can be little doubt that the

- 42 -

explicit Sixth Amendment right of the accused is no less protective of a public trial than the implicit First Amendment right of the press and public. The central aim of a criminal proceeding must be to try the accused fairly, and "[o]ur cases have uniformly recognized the public-trial guarantee as one created for the benefit of the defendant." *Gannett* [*Co. v. Pasquale*], 443 U.S. [368,] 380, 99 S.Ct. [2898,] 2905 [(1979)].

> The requirement of a public trial is for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions. . . . *Ibid*. (quoting *In re Oliver*, 333 U.S. 257, 270, n.25, 68 S.Ct. 499, 506, n.25, 92 L.Ed. 682 (1948), in turn quoting T. Cooley, Constitutional Limitations 647 (8th ed. 1927)).

In addition to ensuring that judge and prosecutor carry out their duties responsibly, a public trial encourages witnesses to come forward and discourages perjury. *See In re Oliver*, *supra*, at 270, n. 24, 68 S.Ct. 499, 506, n. 24, 92 L.Ed. 682; *Douglas v. Wainwright*, 714 F.2d 1532, 1541 (11th Cir. 1983), cert. pending, Nos. 83-817, 83-995; *United States ex rel. Bennett v. Rundle*, 419 F.2d 599, 606 (CA3 1969).

*Waller*, 467 U.S. at 46.

*Waller* involved the trial court's ruling which closed to the public, over the defendant's objection, an entire pre-trial suppression hearing. The Court held that the trial court erred and that it was structural constitutional error when the defendant did not have to prove specific prejudice in order to obtain relief. *Id*., 467 U.S. at 47-48. We note that due to the fact that the constitutional violation in *Waller* occurred during a suppression hearing and not during the trial, the Court limited the relief to which the defendant was entitled. The Court ordered a new suppression hearing, with a new trial granted only if the new suppression hearing resulted in evidence being suppressed that was not suppressed at the prior trial, or if the results of the new hearing materially changed the parties' positions. *Id*., 467 U.S. at 49-50.

The *Waller* Court held, after noting that the "aims and interests," *Id*., 468 U.S. at 46, of a public trial are not less in a pre-trial suppression hearing, that

> in sum, we hold that under the Sixth Amendment any closure of a suppression hearing over the objections of the accused must meet the

tests set out in [*Press-Enterprise Co. v. Superior Court of California*, 464 U.S. 501 (1984)] and its predecessors.

*Waller*, 467 U.S. at 47.

The *Waller* Court reiterated that under *Press-Enterprise Co.*, the party seeking a closure of "the hearing," *Id.*, 467 U.S. at 48, must meet the following tests:

> [1] the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced,
>
> [2] the closure must be no broader than necessary to protect that interest,
>
> [3] the trial court must consider reasonable alternatives to closing the proceeding, and
>
> [4] it must make findings adequate to support closure.

In *State v. Sams*, 802 S.W.2d 635, (Tenn. Crim. App. 1990), this court reversed the defendant's convictions of two counts of aggravated rape, one count of rape, and two counts of sexual battery and remanded the cases for a new trial. The basis of the reversal was that the defendant was denied a public trial when the State, after the trial had begun, subpoenaed all members of the defendant's family attending the trial in order to exclude them from the courtroom under the rule of sequestration. *Sams*, 802 S.W.2d at 640-41. *See* Tennessee Rule of Evidence 615. This court stated that the prosecutor's motive to remove the defendant's relatives from the courtroom during the trial was obvious. *Sams*, 802 S.W.2d at 640. The court stated

> [The prosecutor] did not want the victims, the appellant's children, to face their relatives during their testimony. As a result, the safeguard that attempts to improve the quality of testimony by discouraging perjury and abusiveness was seriously impaired. *In cases of this nature, a victim's knowledge that family members are in the courtroom constitutes the strongest safeguard an accused can have against perjured or abusive testimony.*

*Id.* at 640-41 (emphasis added).

This court also concluded that the prosecutor, by his statements in court, made it "crystal clear that he used the subpoena power of the trial court as a subterfuge for excluding the appellant's relatives from the courtroom. [The prosecutor] had no intention of calling these individuals as witnesses." *Id.*, 802 S.W.2d at 637. None of the family

- 44 -

members subpoenaed by the prosecutor were called as witnesses. *Id*. at 641. The court concluded that the prosecutor "did not hesitate to trample the constitutional rights of the appellant to gain a tactical advantage." *Id.*, 802 S.W.2d at 641. The only reason given by the prosecutor for issuing the subpoenas during a lunch break for the defendant's family members was that it had been reported to him that when a witness (one of the victims) testified before lunch, the defendant's grandmother and those people seated behind defendant were talking loudly. *Id*. at 636. The trial court did nothing while this allegedly occurred, indicating the judge did not hear any talking. *Id*. The defense attorney stated that he heard no talking. The prosecutor did not hear it because he stated to the trial court that it was brought to his attention by a spectator. *Id*. The prosecutor, after announcing the subpoenas had been issued during the lunch break for the defendant's grandmother, two aunts, brother, and stepmother, requested that they be required to leave the courtroom because the defendant had "asked for the rule [of witness sequestration]." *Id*.

As set forth at the outset of the discussion of this issue, Defendant implicitly acknowledges that he must seek relief pursuant to the doctrine of plain error. The issue involving a constitutional violation by denial of a public trial, while objected to by Defendant at trial, was not included in his motion for new trial. Tenn. R. App. P. 3(e) (In all cases that are tried by a jury, as to all issues wherein the defendant seeks a new trial, an issue must be included in a motion for new trial or it is treated as waived). Not surprisingly, the State argues on appeal that Defendant is not entitled to relief pursuant to plain error review. Yet, the State acknowledges in its brief that

> [i]f the defendant had properly raised this issue in his motion for new trial and demonstrated a violation of the right to a public trial, prejudice requiring reversal would be implied. *See State v. Bowman*, 327 S.W.3d 69, 91 (Tenn. Crim. App. 2009) (noting that structural errors, like denial of a public trial, require automatic reversal when they occur).

Tennessee Rule of Appellate Procedure 36(b) provides in part that

> [w]hen necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal.

We agree with Defendant and grant relief pursuant to plain error review.

The law is well settled in Tennessee that before a defendant is entitled to relief under plain error review, *all* five of the factors set forth in *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994), must be established. *State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000). Also, the "'plain error' must [have been] of such a great

magnitude that it probably changed the outcome of the trial.'" *Id.* at 283 (quoting *Adkisson*, 899 S.W.2d at 642).

The *Adkisson* factors are:

> (a) the record must clearly establish what occurred in the trial court;
> (b) a clear and unequivocal rule of law must have been breached;
> (c) a substantial right of the accused must have been adversely affected;
> (d) the accused did not waive the issue for tactical reasons; and
> (e) consideration of the error is necessary 'to do substantial justice.'

*Id.* at 282.

The State argues that there is no breach of a rule of law because the trial court complied with the factors in *Waller*, set forth above. We disagree with the State.

The *Waller* factors are in reality judicially created exceptions to the constitutional right that the accused has to a public trial. Review of each factor illustrates that the first factor was not met for multiple reasons. First, the State submitted absolutely no evidence, testimonial or other type, to support its assertion that an order denying Defendant a public trial during the victim's testimony was necessary to protect an overriding interest that would be otherwise prejudicial to the State. This court in *Sams*, in an identical situation, stressed the importance of a constitutionally mandated public trial, especially as to the defendant's family members. Statements by the prosecutor as to the victim's being uncomfortable with Defendant's family members present are all that was relied upon by the trial court. It is well settled that statements by attorneys in such situations are not evidence. *State v. Roberts*, 755 S.W.2d 833, 836 (Tenn. Crim. App. 1988). Furthermore, even if all "facts" relied upon by the trial court had been submitted by admissible evidence, it would not establish enough evidence by the State to meet its burden under the first factor in *Waller* in light of *Sams*.

The State also cannot establish the third *Waller* factor, that the trial court must consider reasonable alternatives to the closure of the trial. This was not done by the trial court. The State argues that the trial court somehow met this requirement by the court acknowledging the fact that Shelby County courtrooms are *not* set up for remote closed circuit testimony by a victim outside the courtroom, so that option was not available. This argument is misplaced for two reasons. First, it is obvious that a "reasonable alternative" to closure of the trial must actually be available in order to meet the requirement of *Waller*'s third factor. Second, it is apparent through the trial court's comments in its ruling that the court was focusing on Defendant's Sixth Amendment right to *confrontation* rather than his constitutional right to a public trial. Such comments include: (1) "And our courts have held it is not a violation of a defendant's *right to confrontation* if the defendant is in the courtroom, the victim is testifying in another

- 46 -

room. . . .”; (2) concluding no prejudice to Defendant to exclude all members of the public when the victim testifies, “[Defendant] has the *right to confront*, has a right to be present during all the questioning of this victim.”  (3) “nothing in the Tennessee or federal law that would indicate that a defendant’s family members have a right to be present at all stages of the trial and have a right to be present when all witnesses are testifying . . . .”  “[Defendant] has a *right to be present himself*, does not have a right to say, ‘Judge Coffee, I want my family members present.’”

*Sams* makes it clear that closing the courtroom during a victim’s trial testimony because of the victim’s reluctance to testify in the presence of a defendant’s family members defeats the purpose of the accused’s constitutional right to a public trial.  *Sams*, 802 S.W.2d at 640-41 (“[The prosecutor] did not want the victims, the appellant’s children, to face their relatives during their testimony.  As a result, the safeguard that attempts to improve the quality of testimony by discouraging perjury and abusiveness was seriously impaired.”).

By focusing on Defendant’s constitutional right to confrontation of witnesses against him, and implicitly basing its ruling in substantial part on Defendant’s family members not having a right of confrontation, the trial court totally failed to address the issue of excluding all members of the public from the courtroom during the victim’s trial testimony in light of Defendant’s constitutional right to a public trial.  It is error to deprive a defendant of the right to a public trial based upon the fact the constitutional right to *confront witnesses* does not apply to members of the public, including Defendant’s family.  It defies logic to come up with “reasonable alternatives” to closing to the public any portion of a trial when it is clear that the trial court granted the State’s motion to close any part of the trial proceedings based upon the wrong constitutionally protected right.

As to the second *Waller* factor, the closure of trial proceedings was a complete closure of all members of the public except the victim, the attorneys, court staff, and persons requested by the victim.  It is evident to this Court that the State’s motion for the closure was erroneously granted based upon: (1) no evidence being submitted; (2) if evidence supporting the “facts” relied on by the trial court had been submitted, it still would not have met the first factor in *Waller*; and (3) the trial court failed to address Defendant’s right to a public trial.  Under these circumstances, no closure at all is necessary or allowable.

Finally, *Waller’s* fourth factor, that the trial court must make findings adequate to support closure, it is clear that findings of fact must be based upon some type of proof.  Assertions by a prosecutor during argument of a motion cannot suffice to justify any exception to constitutional rights. *Roberts*, 755 S.W.2d at 836. Proof could be, but not limited to, testimony, medical evidence, or psychological evidence.  Even then, reasonable alternatives to closure that could be considered would be allowing a guardian

- 47 -

of the victim to sit with the child, using a qualified courtroom canine for witness comfort, or other tools and accommodations suggested by Defendant or the State. The statements made by the prosecutor specifically about the victim to support the motion to close the courtroom during the victim's testimony are: (1) the victim is seven years old and extremely shy; and (2) the victim is reluctant to testify in the presence of people whom she does not know. At the outset of Defendant's objection to closing the courtroom, the trial court, without permitting any argument by defense counsel, proceeded to address the motion for closure, taking approximately five pages of transcript, and concluded by granting the motion to close the courtroom during the victim's testimony.

The trial court stated in the third sentence, "I have not seen the seven-year-old child in this case." During its ruling, the trial court added, "[a]nd what I'm told is that the child is very sensitive, very, very uncomfortable." The trial court subsequently added that it could not say that members of Defendant's family should be allowed in the courtroom "when I'm told that the victim, alleged victim, witness would be very uncomfortable in looking at certain people while she is testifying."

The State's motion for admissibility of the victim's forensic interview was heard after the motion to close the courtroom was granted, but on the same day. The victim testified during that hearing. Her testimony comprised two pages of the testimony, and it primarily involved her confirming that she was in the forensic interview video, that she told the truth during the interview, and that she remembered the events described and could answer questions about them. The trial court gave information to the victim about the proceedings at the trial.

Arguments on Defendant's motion not to allow the video of the forensic interview to be admitted as evidence were heard immediately following the State concluding its proof in support of admission into evidence of the forensic interview. In its ruling granting the State's motion to allow the forensic interview to be played for the jury, the trial court made findings of fact. Interestingly, after having seen the forensic interview and the victim's testimony in court, as well as the lengthy colloquy with the victim in the witness chair, the trial court included the following findings of fact specifically concerning the victim:

> She is, at the age of four, and at the age of seven right now, she is a very mentally and physically mature child. It's amazing that she was able to tell Teresa Onry in December of 2013 with a clear mind, clear memory, and to relate those things clearly and without hesitation questions that she was asked and answers that she provided. This is a very precocious four-year-old child and very physically and mentally mature at the age of four.

This finding of fact, based upon evidence presented in court, actually weighs against the trial court's conclusion that Defendant's right to a public trial must be denied during the victim's testimony.

Based on all of the above, we conclude that the trial court committed structural constitutional error by granting the State's motion "[t]hat the courtroom be closed to the media and all persons who are not required by law or requested by the child to be present in the courtroom during the child victim's testimony."

As set forth above, in order to obtain relief from the trial court's error, Defendant must first satisfy all of the five *Adkisson* factors. At this point, it is prudent to repeat them here:

(1) the record must clearly establish what occurred in the trial court;
(2) a clear and unequivocal rule of law must have been breached;
(3) a substantial right of the accused must have been adversely affected;
(4) the accused did not waive the issue for tactical reasons; and
(5) consideration of the error is necessary to do substantial justice.

The State challenges Defendant's request for relief under plain error based upon Defendant's failure to establish factors (2), (3), and (5). The State does not challenge applicability of factors (1) and (4). It is obvious that the record clearly establishes what occurred in the trial court (factor (1)) and that Defendant did not waive the issue for tactical reasons (factor (4)). There cannot logically exist, based on the record, waiver of the issue for tactical reasons. Defendant objected to and opposed the State's motion at the hearing, he argued against it as much as the trial court would permit, the objection was noted by the trial court, and the only reason it is before us for plain error review is that the issue was somehow omitted from a written motion for new trial that comprises ten pages in the record. Once an objection is properly made in the trial court, generally there can be no reasonable strategy to waive an issue for tactical reasons by omitting it in a motion for new trial.

Thus, we will address the State's arguments that factors (2), (3), and (5) of *Adkisson* were not established by Defendant. Initially, the State points out that three witnesses who testified on his behalf would have been excluded under the witness sequestration rule, Tennessee Rule of Evidence 615, even if the courtroom had not been cleared during the victim's testimony. The witnesses were one of the Defendant's grandmothers, Defendant's girlfriend, and a sister of Defendant. During the motion hearing on the day prior to trial, Defendant's counsel mentioned that Defendant's mother desired to be present during the trial. She did not testify at trial. The State cites no authority which would allow an exception to the constitutional right of a public trial simply because some family members and/or friends of a defendant are required to be outside of the courtroom pursuant to Rule 615. Also, since the State failed to present any

evidence pertaining to its motion, indicating the specific persons whose presence in the courtroom during the victim's testimony would prejudice the State, the State's argument that three defense witnesses would be excluded from the courtroom anyway, has no relevance to the issue presented.

The State argues that Defendant failed to show that a clear and unequivocal rule of law was breached. In support of its assertion, the State submits that the trial court complied with the *Waller* factors. We have already concluded that the trial court failed to comply with the *Waller* factors, and this argument by the State is accordingly without merit. We note that the United States Supreme Court case cited by the State, *Globe Newspaper Co. v. Superior Court*, 452 U.S. 596 (1982), is a case addressing the First Amendment right of the media to attend a trial, not the right of a defendant in a criminal case to have a public trial pursuant to the Sixth Amendment. The case involved a criminal trial wherein the defendant was acquitted, and the appellant was Globe Newspaper Co. which challenged a Massachusetts statute, Massachusetts Gen. Laws Ann., ch. 278 § 16A (West 1981) that mandated that in the trials of certain designated sex offenses where the victim is a minor, the court shall exclude the general public from the courtroom. In another case relied upon by the State, *Geise v. United States*, 262 F.2d 151 (9th Circ. 1958), the order of closure of trial proceedings had several exceptions to it, including the relatives and close friends of the criminally accused defendant, members of the press, and relatives and close friends of the victim. *Id*. at 155. These groups include the specific groups the State sought to exclude from the courtroom in the case *sub judice*.

The State relies upon *Weaver v. Massachusetts*, 137 S.Ct. 1899 (2017), in support of its argument that Defendant failed to establish the *Adkisson* factors that: a substantial right was adversely affected, and that consideration of the error is necessary to do substantial justice. Again, the constitutional right under consideration is the right to a public trial guaranteed by both the United States and the Tennessee constitutions. If a violation of it is found, structural constitutional error results, prejudice is implied and automatic reversal is required. *State v. Bowman*, 327 S.W.3d 69, 91 (Tenn. Crim. App. 2009).

The State insists that *Weaver* prohibits relief to Defendant in the case *sub judice* under the plain error doctrine. The State draws upon *Weaver's* holding to argue that Defendant is foreclosed from relief because Defendant "fails to prove the probability of a different outcome [other than conviction], or that his trial was fundamentally unfair." However, in its brief the State acknowledges that Defendant asserted his Sixth Amendment constitutional right as an accused to have a public trial, in both the trial court and on appeal, and that a violation of the right to a public trial, if addressed by the appellate court, requires automatic reversal as set out in *Bowman*.

The State even asserts that Defendant failed to "offer any argument regarding prejudice when asked by the trial court." This assertion is misplaced. It is correct that

- 50 -

the trial court made the following statement in open court: "you [defense counsel] have to articulate or tell me why it somehow is prejudicial to [Defendant] if his family and other members are not allowed to be present in court when that child is in fact testifying." What the State did not mention is that there was no pause by the trial court to allow a response, and the trial court continued to talk enough to take up three and one-half pages of transcript that concludes with the trial court granting the State's motion before allowing any argument to be made by trial counsel. Accordingly, the State's assertion that Defendant is not entitled to relief because his counsel did not respond to the trial court's "invitation" to show prejudice is without merit.

As to the State's reliance on *Weaver*, we conclude that it is misplaced. *Weaver* involved review of the denial of a constitutional right to public trial before the court through an ineffective assistance of counsel claim in a post-conviction proceeding, and not in a direct appeal from conviction. The issue in *Weaver* was whether automatic reversal due to structural constitutional error applied in that context, and its holding is limited to post-conviction proceedings. *Id*. 137 S.Ct. at 1905 ("The question is whether invalidation of the conviction is required here as well, or if the prejudice inquiry is altered when the structural error is raised in the context of an ineffective-assistance-of-counsel claim.").

Another argument made by the State in support of its assertion that Defendant has failed to show that his trial was fundamentally unfair is that Defendant did not include the issue in his motion for new trial. This argument is totally without merit. If every Defendant who raises an issue under the plain error doctrine was automatically denied any relief because of the occurrence or non-occurrence of an action that restricts appellate review to plain error relief, then plain error review would never be available and *Adkisson* and *Smith* would in effect be abrogated.

Directing our attention to the three *Adkisson* factors challenged by the State, we conclude that all three (plus the two not challenged by the State which we have already concluded have been shown) have been shown such that Defendant is entitled to relief under the plain error doctrine.

Our conclusions above establish that the constitutional right to a public trial (a clear and unequivocal rule of law) was breached. The trial court excluded from the courtroom everyone except court staff, the attorneys, the victim's mother, and two other adults requested by the victim during the victim's testimony. The trial court made findings of fact which the record shows were based solely upon argument by the prosecutor without even a shred of evidence presented. Furthermore, the trial court's statements indicate that it made its ruling based upon considerations involving the Sixth Amendment right of a defendant to confront witnesses and not upon the issue raised - the Sixth Amendment right of the accused to a public trial. The trial court's erroneous ruling plainly and adversely affected Defendant's substantial right to a public trial, an error that

is a structural constitutional error requiring automatic reversal. If this Court refuses to address the structural constitutional error because it was omitted from the motion for new trial, even though a proper objection was made which alerted the trial court to the possibility that the State's motion should be denied, substantial justice, to both Defendant and our judicial system, would be denied. Accordingly, review is necessary.

Finally, the State argues that the error fails to satisfy the factor that it probably changed the outcome of the trial. *Smith*, 24 S.W.3d at 283. In its brief, as noted above, the State concedes "If the defendant had properly raised this issue in his motion for new trial and demonstrated a violation of the right to a public trial, prejudice *requiring reversal* would be implied." (citing *Bowman*, 327 S.W.3d at 91) (emphasis added).

We have concluded that there was a violation of the right to a public trial pursuant to *Sams* and that the *Waller* factors were not established. As shown in the record, the trial court was firm in its opinion that the State's motion to close the courtroom must be granted despite Defendant's objection. Obviously, reiterating the objection in a motion for new trial filed after the conclusion of the trial could not affect the Court's ruling *during* the trial.

At the hearing on the motion for new trial, the State's entire argument was, "Judge, the State's position is that there were no errors made in Your Honor's rulings at trial and that the motion for new trial should be denied." Also, prior to addressing any of the issues included in the motion for new trial, the trial court stated,

> And, for the record, all of these issues were addressed in pretrial motions and at trial and I will incorporate the findings that the court made. Motions heard in this case on Monday, July 18, 2016, [which includes the State's motion to close the public from the courtroom] will incorporate the rulings that the court made in the pretrial hearing.

Our review of the trial court's rulings on the issues in the motion for new trial reflect that the trial court reiterated all the same reasoning he made pre-trial and during the trial. To this court there is absolutely no doubt that had the motion for new trial included the ground that, "the trial court erred and violated Defendant's constitutional right to a public trial during the victim's testimony," the trial court would have denied it based upon its earlier rulings.

Even if a showing that the error "probably changed the outcome of the trial," *Smith*, 24 S.W.3d at 283, is applicable when the error is structural constitutional error, the error would definitely change the ultimate outcome of the trial in this direct appeal if included in the motion for new trial. Under all the circumstances reviewed, we conclude that Defendant has established all of the *Adkisson* factors and is entitled to automatic reversal and a new trial.

For the same reasons, it was structural constitutional error for the trial court to close the pre-trial motion hearing during the victim's testimony (in addition to doing so at trial), which is also, for the same reasoning, determined on plain error review.

CONCLUSION

The judgments of the trial court are reversed, and the case is remanded for a new trial consistent with the opinion of this court.

_____
THOMAS T. WOODALL, JUDGE